**In re TELECTRONICS PACING SYSTEMS, INC., Accufix Atrial "J" Leads Products Liability Litigation**

**Nos. MDL—1057, C–1–95–87.**

United States District Court,
S.D. Ohio,
Western Division.

March 8, 2001.

Richard Stuart Wayne, Strauss & Troy, Cincinnati, OH, Ronald Richard Parry, Arnzen Parry & Wentz, Covington, KY, Stanley Morris Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for Eugene H Owens, on behalf of himself and all others similarly situated.

Ronald Parry, Arnzen Parry & Wentz, Covington, KY, for Elise Marie Owens.

Frank Chester Woodside, III, James Albert Comodeca, Dinsmore & Shohl, Cincinnati, OH, Charles P Goodell, Jr., Richard M Barnes, Goodell DeVries Leech & Gray, Baltimore, MD, for TPLC Inc. dba Telectronics Pacing Systems Inc.

Frank Chester Woodside, III, Dinsmore & Shohl, Cincinnati, OH, Charles P Goodell, Jr., Goodell DeVries Leech & Gray, Baltimore, MD, for Telectronics Holdings Ltd.

Gerald Joseph Rapien, Daniel R Warncke, Taft Stettinius & Hollister, Cincinnati, OH, for Telectronics Pty Limited.

Amanda Frost, Public Citizen Litigation Group, Washington, DC, amicus.

Gerald Joseph Rapien, Daniel R Warncke, Taft Stettinius & Hollister, Cincinnati, OH, S Patrick McKey, Gardner Carton & Douglas, Chicago, IL, for Pacific Dunlop Limited and Nucleus Limited.

Virginia Conlan Whitman, Special Master, Cincinnati, OH.

## OPINION

SPIEGEL, Senior District Judge.

This matter is before the Court on the Sixth Circuit's July 19, 2000 Order Reversing the Class Action Settlement (doc. 903); the Court's November 20, 2000 Order Preliminarily Approving the Settlement (doc. 964); Defendants TPLC's and Teletronics' Motion in Support of the Proposed Settlement Agreement (doc. 1016); the PSC's Motion in Support of the Proposed Settlement Agreement (doc. 1018); Defendants Pacific Dunlop Ltd.'s and Nucleus's Joint Motion in Support of the Proposed Settlement Agreement (doc. 1021); and Public Citizen's Memoranda in Opposition to the Proposed Settlement Agreement (docs. 1004, 1005, 1024 & 1096).

In addition, the Court held an all-day Fairness Hearing in this matter on February 15, 2001, which was open to the all of the class members, Counsel representing the Parties to this action, any Objectors or opt-out claimants to the proposed settlement, and to Public Citizen, as *amicus curiae* (doc. 1035).[1]

---

1. Due to the fact that the Court is submitting two Orders on similar subjects that will be filed on the same day, one Order for the Approval of the Second Settlement and one Order for the Approval of the Applications for Fees and Expenses, the Court directs that these Orders be referred to as such in the future by the Parties to this case.

## I. BACKGROUND

### A. Introduction

#### 1. The Complaint.

This case involves a nationwide products liability action, alleging that Defendant TPLC Holdings, Incorporated (formerly, Telectronics Pacing Systems, Incorporated) and Defendants Accufix Research Institute, Incorporated (formerly TPLC, Incorporated) (hereinafter, "TPLC" or "ARI")[2], as well as Pacific Dunlop Limited (hereinafter, "Pacific Dunlop" or "PDL") and Nucleus Limited ("Nucleus") (hereinafter, collectively referred to as the "Australian Defendants" or "Defendants"), allegedly placed into the stream of commerce defective Accufix Atrial "J" Pacemaker Leads, Model Nos. 330–801 and 329–701 (hereinafter, referred to as the "J Leads" or the "Accufix Leads") (*see* doc. 1, the "Complaint").[3]

#### 2. Defendants' Responses.

Pacific Dunlop is a publicly-traded Australian company (*see* doc. 1021). At relevant times, Pacific Dunlop was the ultimate parent and beneficial owner of Accufix Research Institute, Inc. f/k/a/ TPLC, Inc., and TPLC Holdings, Inc. f/k/a/ Teletronics Pacing Systems, Inc. (hereinafter, collectively known as "Teletronics"). Teletronics manufactured, marketed, and distributed the Accufix Atrial "J" Leads, Model Nos. 329–701

and 330–801, that are the subject of this litigation. The "Nucleus" corporation is a wholly-owned subsidiary of Pacific Dunlop that also held, at relevant times, a beneficial ownership interest in Teletronics.

On behalf of all recipients of Accufix Leads (and their spouses), the Plaintiffs' Steering Committee (hereinafter, the "PSC", "Plaintiffs," or "Plaintiffs' Counsel") alleged in the Complaint that Teletronics was liable for its manufacture and distribution of the Accufix Leads, and requested compensatory and other damages. With respect to Pacific Dunlop and Nucleus, the PSC alleged that these entities were the principals and/or alter egos of Teletronics and were liable for any injury or damage caused by Teletronics. All Defendants answered the Complaint and denied any wrongdoing or liability for the alleged damages to Plaintiffs.

#### 3. The February 15th Hearing.

On February 15, 2001, the Court held a Fairness Hearing on the Plaintiffs' Steering Committee's Motion To Approve The Proposed Class Action Settlement and Mandatory Class Certification (hereinafter, the "February 15th Hearing") (*see* docs. 1018 & 1035).

At the February 15th Hearing, the Court also heard oral arguments from members of the PSC in support of class

---

**2.** For the purpose of this Order and for consistency, Teletronics, TPLC Holdings, TPLC and ARI refers to the same corporation and these labels may be used interchangeably in this Order in reference to the primary Defendant named in the Complaint (*see* doc. 1).

**3.** A company by the name of "Cordis" was also originally named as a Defendant in some of the suits that were initially filed, although it is not named as a Defendant herein. TPLC purchased assets from Cordis in 1987, including the right to sell Leads like the kind at issue in this case. Cordis was responsible for

testing the Lead design for the Food and Drug Administration's ("FDA") approval and made certain representations to the Agency in order to permit the sale of the Leads. TPLC and Cordis dispute who is responsible for the design. Cordis and TPLC entered into an agreement under which TPLC withdrew its motion to file a third party claim against Cordis and indemnified Cordis with respect to any claims related to these Leads in exchange for a settlement payment of $6 million. *See In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870, 875 n. 3 (6th Cir.2000).

certification and settlement approval as well as arguments made in support of the proposed settlement by attorneys representing Defendants TPLC, PDL, and Nucleus.

Additionally, the Court heard arguments presented by Ralph Nader's public advocacy group, Public Citizen, as *amicus curiae* (*see* 1006), which opposes certain aspects of the Proposed Settlement Agreement (hereinafter, referred to as the "Second Settlement" or the "Agreement"). The Court granted Public Citizens *amicus curiae* status even though it did not seek leave to intervene or formally object, but instead filed a Motion for Leave to Participate as *Amicus Curiae* (docs. 1004 & 1005). Apparently this is the case, because its only client, Harold Reed, has withdrawn his Objections and he has decided to opt-out of this Settlement.

The Court will detail the arguments of Public Citizens in a later section of this Order.

### 4. Dr. Granata's Report.

The PSC also submitted into evidence the Report of Atillio V. Granata, M.D., M.B.A. (hereinafter, the "Report"), which Report concludes that the amount of monies allocated to the Patient Benefit Fund and the Reserve Fund (hereinafter, collectively referred to as the "Fund") is ample enough to cover the 2001 Plan of Allocation drafted by Class Counsel (hereinafter, referred to as the Second Plan of Allocation) (*see* doc. 1015).

In connection with the Settlement of 1998 (hereinafter, the "First Settlement"), the PSC consulted with Alan L. Hillman, M.D., M.B.A., and an Associate Professor of Medicine and Associate Professor of Health and Management at the School of Medicine and the Wharton School of the University of Pennsylvania. Professor Hillman was consulted in order to determine whether sufficient funds existed to pay all claims according to the 1998 Plan of Allocation (hereinafter, referred to as the "Second Plan of Allocation").

Dr. Hillman had concluded that the Settlement Master would be able to distribute the settlement proceeds according to the First Plan of Allocation. Dr. Hillman's 1998 Report was filed with this Court at that time. In our Order approving the First Settlement, the Court noted that we found Dr. Hillman's analysis credible and persuasive (doc. 712). *See In re Telectronics Pacing Sys., Inc.,* 186 F.R.D. 459, 470 (S.D.Ohio 1999).

### 5. The Members of the Class.

As of the February 15th Hearing, the class totaled over 25,000 members, approximately 13,000 members are alive and 12,000 are deceased, with the average age of the class members estimated by the Settlement Master to be approximately 77.5 years of age. Only two of the class members were present at the Hearing, and although they were given an opportunity to be heard on the record, the two class members who were present at the Hearing chose not to speak on the record at that time.

There were no other formal Objectors, opt-out individuals, or class members at the Hearing.

### 6. The Objectors.

As of the date of the February 15th Hearing, the Court is aware of no Objectors to this Settlement, except for those of class member Viola Watts, who agreed with the concerns of non-party and non-intervener, Public Citizen, which was given a full opportunity to be heard by the Court during the Hearing in regards to the issue of the approval of the Settlement Agreement.

### 7. The Court's Holding.

The PSC, Plaintiffs' Counsel, Defendants' Counsel and Public Citizens diligently briefed the issue of approval of the proposed Second Settlement Agreement in regards to this class action, providing the Court with a significant amount of briefing, memoranda of law citations, submissions, testimonials, and other evidence.

Having reviewed and considered all of the briefs, points of authority, and supporting documents filed with the Court, as well as considering the oral arguments, testimony, documentary evidence, declarations, and objections made on the record at the February 15th Hearing, the Court is now prepared to rule on the PSC's Motion To Approve The Proposed Class Action Settlement and Mandatory Class Certification. This Opinion and Order sets forth the Court's ruling on these matters.

After reviewing the entire Second Settlement, we conclude that the Agreement as a whole is fair, adequate, and reasonable in this case. Therefore, we GRANT Plaintiffs' Steering Committee's and Defendants' Motions To Approve The Proposed Class Action Settlement (docs. 1016, 1018 & 1021).

### B. *Factual History*

Defendant Teletronics manufactured the Accufix Atrial "J" Lead (*see* doc. 1018). The Lead is part of a pacemaker that physicians routinely surgically implant to restore a normal heartbeat. Teletronics distributed Model No. 330–801 and 329–701 in the United States. The J–Lead is a fish hook shaped electrode that is implanted in the atrium of the heart. The Lead contains two coiled electrical wires. The Lead also has a three and one-half inch long flat wire. The flat wire is known as the "stiffner wire," or "retention wire," or "J-wire."

This wire maintains the shape of the Lead during and after implantation. The wire is encased directly underneath the polyurethane insulation. As the heart beats, the retention wire bends back and forth. The flexing wire causes the wire to experience stress. The stress, in some circumstances, causes the flat wire to break. This broken wire can protrude through the polyurethane and cause serious injury to the heart or blood vessels.

Surgeons implanted approximately 40,-500 Teletronics' "J" Leads worldwide between 1987 and October of 1994. The PSC asserts that there were in excess of 25,000 Accufix Atrial "J" Leads sold to patients in the United States between 1987 and 1994 (doc. 1018). Of those implanted, the PSC contends that, as of the 1998 First Settlement, there were approximately 14,000 patients who are alive with a Lead intact. A significant number of those 14,000 patients have died in the 2 years that has passed between the First Settlement and the Second Settlement.

Model Nos. 330–801 and 329–701 share identical design and engineering characteristics. Each member has a lead with the same design failure: a "J" retention wire that can fracture from metal fatigue. In each Lead, a "J" stiffener wire is located outside of the coiled conductor wires.

Between December 1988 and October 1994, Defendant Teletronics learned that seven J–Lead retention wires fractured. In four of the seven cases, the retention wire protruded through the polyurethane insulation and through the patient's right atrial appendage into the aorta. These four individuals experienced hemorrhage and cardiac tamponade. Two of the patients died from cardiac tamponade. The two remaining patients underwent invasive medical procedures to aspirate the blood from the sac surrounding the heart. They also underwent surgery to repair the lacerations that caused the cardiac tamponade.

On October 26, 1994, Teletronics notified the FDA's Denver District Office that it was recalling (hereinafter, the "Recall") all of the non-implanted J–Leads, Models 329–701 and 330–801. Prior to FDA notification, Teletronics notified its field representatives, regional sales directors, and business unit managers of the Recall. Hospital administrators officially learned of the Recall on October 21, 1994. Pursuant to FDA requirements, Teletronics sent letters to physicians informing them of the Recall and providing them with information regarding reports of fracture and the results of their Multi–Center Study. These letters have been referred to as the "Dear Doctor Letters."

Currently, the medical community considers fluoroscopy the most effective method of detecting a fractured retention wire, and in most class members removal of the Lead is not considered the preferred method of treatment. Typically, a Lead recipient can undergo fluoroscopy when he or she attends a regularly scheduled pacemaker examination.

## C. *Consolidation*

On February 13, 1995, Plaintiff Eugene Owens filed a class action lawsuit in the United States District Court for the Southern District of Ohio, alleging injury due to a defective "J" Lead pacemaker that was manufactured by TPLC.[4] Subsequently, on March 10, 1995, Plaintiffs moved to certify their action as a class action. The Multi–District Litigation Panel (hereinafter, the "MDL") then took jurisdiction of this litigation, consolidating all cases for pretrial purposes and transferring them to this Court.

On July 14, 1995, the Court issued its First Case Management Order, consolidating for pretrial purposes all cases that were part of MDL–1057, appointing a Plaintiffs' Steering Committee to coordinate discovery and other pretrial proceedings, designating Attorney Stanley M. Chesley, of the law firm Waite Schneider, Bayless & Chesley Co., to serve as Lead Counsel of the PSC, appointing Liaison Counsel, Richard S. Wayne, of the firm Strauss & Troy, to serve as Plaintiffs' Liaison Counsel, and setting a briefing schedule on the motion for class certification.[5]

This Court then issued a Second Case Management Order on August 14, 1995, establishing a Joint Plaintiffs–Defendants Federal–State Document Depository located in the United States Potter Stewart Courthouse in Cincinnati, Ohio. By August 19, 1997, a total of 435 cases had been transferred to the Southern District of Ohio by the MDL Panel, of which 409 remained active in the transferee district.

## D. *Preliminary Certification*

On July 20, 1995, Plaintiffs filed an Amended and Consolidated Master Class Action Complaint, alleging causes of actions against TPLC, PDL and Nucleus for: (1) strict liability; (2) negligence; (3) failure to warn; (4) breach of implied warranty; (5) breach of express warranty; (6) fear of future product failure; (7) intentional infliction of emotional distress; (8) fraud; (9) misrepresentation; (10) medical monitoring; and (11) loss of consortium.

Thereafter, on November 17, 1995, the Court certified the class as including: "all persons worldwide who have had the Accu-

---

4. *Eugene Owens v. TPLC, Inc.*, Case No. 1:95–87 (S.D.Ohio 1995).

5. This Court appointed the Plaintiffs' Steering Committee, consisting of the following lawyers: Stanley M. Chesley, Daniel E. Becnel, Jr., R. Eric Kennedy, Thomas D. Rogers, Rog-

ers P. Brosnahn, Jack Baldwin, Arthur Sherman, Calvin Fayard, Richard S. Wayne, Ron Parry, David J. Guinn, Elizabeth Cabraser, David S. Bershad, Charles Zimmerman, Martis Ann Brachtl, Louis F. Gilligan, and Arnold Levin.

fix Atrial 'J' Pacemaker Leads, including the retention wire, Model 330–801, Model 329–701, and Model 088–812, placed in their bodies" (doc. 89). The Court then ordered that the class be certified on the common issues of negligence, strict liability, fraud, misrepresentation, and breach of warranty. Also, the Court ordered that a medical monitoring class be established. The Court, however, denied class certification for issues regarding causation and damages (*Id.*).

Also in the Fall of 1996, the PSC learned of the sale of substantially all of the assets of Teletronics to Pacesetter, Inc. (doc. 1018). Immediately upon learning of the impending transaction, the PSC sought a Temporary Restraining Order and Preliminary Injunction to preserve the assets of Teletronics and maintain them in the United States. As a result of the Plaintiffs' efforts, the PSC and Teletronics entered into an agreement that required ARI to retain the assets from this transaction in North America. Additionally, Teletronics agreed to provide the Court and the PSC with regular financial statements regarding the finances of Teletronics.[6]

Defendants then moved for this Court to reconsider our Order certifying the class, or, in the alternative, for an interlocutory appeal pursuant to Title 28 U.S.C. § 1292(b). On February 23, 1996, after reviewing Defendants' motion for reconsideration, the Court granted in part and denied in part the motion and denied Defendants' request for an interlocutory appeal (doc. 137). Consequently, the Court decertified the international class and reaffirmed our decision certifying a class that included United States class members (doc. 139).

Although the Court did not decertify the United States class at that time, the Court later decertified the class on July 16, 1996, in light of the Sixth Circuit's decision *In re American Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir.1996) and other progeny cases (doc. 189).[7]

### E. The Second Class Certification

On September 29, 1996, Plaintiffs renewed their motion for class certification. The Court granted the motion on April 2, 1997, recertifying a nationwide class of "J" Lead implantees with sub-classes for the claims of negligence, strict liability, and medical monitoring (doc. 370). Defendants appealed the decision and filed a petition for a writ of mandamus with the Sixth Circuit Court of Appeals to vacate our recertification decision. The Sixth Circuit denied Defendants' petition for a writ of mandamus and dismissed the interlocutory appeal for lack of jurisdiction. Although Defendants sought a rehearing of the denial of the petition for a writ of mandamus, the Sixth Circuit rejected Defendants' request.

This Court also considered the Australian Defendants' motion to dismiss for lack of personal jurisdiction. However, we denied their motion on February 3, 1997 (doc. 333).

On December 1, 1997, the Court also denied Defendants' motion for reconsideration of the Court's certification of subclasses one and two, which relate to medical monitoring (doc. 468). Subsequently, on December 3, 1997, the Court approved the Joint Plan for Notice of Pendency of Class Action (doc. 472).

---

**6.** Afterwards, ARI became the successor company to Teletronics and ARI submitted its financial statements to the Court and the PSC.

**7.** *See Matter of Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir.1995); *see also Georgine v. Amchem Prod., Inc.*, 83 F.3d 610 (3rd Cir. 1996); *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir.1996).

## F. *The Summary Jury Trial*

This Court held a summary jury trial in this case, beginning on February 2, 1998, and ending on February 6, 1998.[8] Among the summary jury's findings were the following decisions regarding the liability of the Defendants. *See In re Telectronics Pacing Sys., Inc.,* 186 F.R.D. 459, 464–65 (S.D.Ohio 1999) (discussion of summary jury trial).

First, TPLC was negligent. Second, TPLC was negligent *per se* for failing to comply with the pertinent federal regulations in their filings with the FDA. Third, with respect to the strict liability subclasses:

Sub–Class 5—The "J" lead sold by the Telectronics Defendants failed to perform as safely as an ordinary consumer would expect when they left the possession of the Telectronics Defendants, and this was the proximate cause of injury to the Plaintiffs, and that the activities of the Telectronics Defendants had the capacity to harm the class members as a whole.

Sub–Class 7A—TPLC knew of the risks of fracture. Although TPLC did not fail to provide a warning that a reasonable manufacturer would have provided concerning the risk, the company failed to provide post-market warning that a reasonable manufacturer would have provided concerning the risk; and TPLC's activities had the capacity to cause harm to the class members as a whole.

Sub–Class 7B—The "J" Leads were unsafe to the extent that beyond that which would be contemplated by an ordinary consumer; The seriousness of the injury or the unsafe nature of the design of the "J" Leads was a proximate cause of the Plaintiffs' injuries. Furthermore, even though the warnings at the time of the manufacture regarding the risks associated with the "J" Leads were not inadequate, after the product was manufactured, TPLC did learn or should have learned about the dangers connected with the "J" Leads; however, TPLC did not issue warnings concerning the dangers in a manner that a reasonable product manufacturer would act in the same or similar circumstances, and the activities of TPLC had the capacity to cause harm to the class members as a whole.

Sub–Class 7A—At the time of manufacture of the "J" Leads, there was an alternative design which was capable of preventing the type of injury the Plaintiffs allege; The seriousness of the injuries alleged outweighed the burden of the Telectronics Defendants to use the alternative design; The injuries alleged by Plaintiff resulted from a reasonably anticipated use of the "J" Leads. Additionally, after the product was manufactured, the Telectronics Defendants did or should have learned of the danger of injury to recipients of the "J" Leads; nevertheless TPLC failed to use reasonable care to provide an adequate warning of such characteristic and its dangers to the "J" Leads. Finally, the Telectronics Defendants' activities had the capacity to cause harm to the class members.

---

8. While we realize that the summary jury trial is merely advisory, of no binding effect on anyone, we note that it is a settlement device used to assist the Parties in assessing the results of a trial on the merits. From the experience of this Court in other cases, including class actions where there have been a summary jury trials, the results have been very instructive in helping the parties negotiate settlements. Furthermore, utilization of the summary jury trial technique in this case assisted the Court and these Parties in determining whether a trial on the merits was manageable. The results of the summary jury trial in this case confirmed that a trial on the merits would be manageable.

Sub–Class 8—The "J" Leads failed to perform in a safe way that an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; The risk of danger inherent in the design outweighs the benefits of the design; The failure of the "J" Leads to perform safely or a risk of danger existed at the time the product left the control of the Telectronics Defendants, and that failure or risk was a cause of the Plaintiffs' injuries; The use of the "J" Leads involved a substantial danger that was not readily recognized by the Plaintiffs and that the Telectronics Defendants knew or should have known of that danger; Telectronics Defendants failed to give adequate warnings of such danger and that the failure to warn was the cause of injury to the Plaintiffs; and, the activities of the Telectronics Defendants had the capacity to cause harm to the class as a whole.

The "J" Leads were defective due to a defect in design, and the manufacturer knew, or in light of reasonably available scientific and technical knowledge then existing could have known, of the design characteristic or its danger that caused the Plaintiffs' injuries or of the alternative design identified by the Plaintiffs.

*In re Telectronics,* 186 F.R.D. at 464–65.

Thus, assuming that the jury found TPLC liable on any of Plaintiffs' theories of liability, the summary jury advised that Plaintiffs would recover damages in the amount of $265,000,000.00 ($265 million) for the costs of medical monitoring and the costs and testing procedures. The summary jury did not award damages for individuals with working Leads. The jury recommended substantial damages for in-dividuals that sustained significant medical complications from a Lead fracture or explantation. The jury did not recommend an award of punitive damages.

The jury also found in favor of the Australian Defendants on the theories of agency and alter-ego. Specifically, PDL and Nucleus were found to be not liable to Plaintiffs under any agency theory or as being the parent company of TPLC.

The Class representatives were awarded a total recovery of $7,750,000.00 ($7.75 million).[9] The summary jury found that Plaintiffs were not entitled to punitive damages under any of the three standards of proof, i.e., by a preponderance of the evidence, by clear and convincing evidence, or beyond a reasonable doubt.

### G. *The First Settlement*

Following the summary jury trial, and after allowing the Parties an opportunity to review the strengths and weaknesses of their cases in light of the summary jury's findings, settlement discussions were begun by the Parties, and the Court later scheduled two settlement conferences in this matter: March 19, 1998 and March 26, 1998.

Subsequently, on April 2, 1998, the Parties informed the Court that they had agreed to a settlement in principle.

On July 22, 1998, the Parties presented a Joint Motion for Order Provisionally Certifying a Mandatory Class Action pursuant to Fed.R.Civ.P. 23(b)(1)(B), Approving Settlement, Forms of Notice to the Class Members, Scheduling a Final Fairness Hearing, and Preliminarily Enjoining All Accufix Litigation. Following a hear-

---

9. The award the summary jury indicated that the class representatives would be entitled to is as follows: (1) Chad Baker—$1,000,000.00; (2) Wilford Schultz—$2,000,000.00; (3) Jerri Stayer—$150,000.00; (4) Shelly Truskow-ski—$1,600,000.00; (5) Rattana Soumphon-phakdy (deceased)—$3,000,000.00; and (6) Jamie Baldwin, Harold Bechert, and Annette Gatale would receive no damages.

ing on the matter, the Court indicated tentative approval of the proposed settlement by approving the form and manner of dissemination of the notice to prospective class members, and temporarily enjoining all Accufix Atrial "J" Lead litigation (hereinafter, referred to as the "First Settlement").

The Court then scheduled the First Fairness Hearing for November 19, 1998, and provided for Objectors and their Counsel to be heard at the Hearing.

On August 3, 1998, Class Counsel and the Defendants jointly filed a motion seeking an Order appointing a Settlement Master to fulfill the settlement goals. On August 11, 1998, the Court appointed Attorney Virginia C. Whitman to serve as Settlement Master in this matter (doc. 525)

Notice was provided to the Class regarding the class action and proposed settlement, and the date and time for the Fairness Hearing via advertisements (hereinafter, "Notice Materials") in *USA Today,* a nationally distributed newspaper, on September 25, 1998 and October 2, 1998. Also, Notice Materials were sent by first class mail to potential class members on September 14, 1998 and October 10, 1998. Any inquiries regarding the Notice of the settlement and hearing dates were taken and responded to by Star Bank, N.A., of Cincinnati, Ohio, Virginia Whitman, Esq. and the PSC.

As of the date of the November 19th Hearing, fifty-three (53) out of the total class of 17,366 individuals filed Objections and Letters in opposition to the proposed settlement.

On March 5, 1999, this Court approved the First Settlement Agreement (docs.710–712). *See In re Telectronics Pacing Sys., Inc.,* 186 F.R.D. 459 (S.D.Ohio 1999).

## H. *The First Plan of Allocation; A Comparison.*

The First Plan of Allocation in the First Settlement of 1998 is nearly identical to the Second Plan of Allocation, which is the subject of the PSC's and Plaintiffs' Counsel Joint Motion to Approve the Second Settlement in the case at bar. The Second Plan of Allocation takes into account information made available to the PSC regarding the size of the class, the age of the class, the explant history of the class, the rate of medical complications associated with fracture and explant, and the advice of medical practitioners.

Under the Second Settlement Agreement, the Settlement Master, Virginia Whitman, Esq., has the authority to make adjustments to the compensation levels and the documentation required to establish a claim if she determines that the adjustments are necessary.

The First Settlement Agreement was summarized as follows: There shall be four (4) funds established and funded by the Telectronics Defendants: (1) Patient Benefit Fund, (2) Operating Fund, (3) Litigation Fund, and (4) Reserve Fund.

First, a Patient Benefit Fund was to be established in which TPLC deposited $47,275,297.00 ($47.2 million) and PDL deposited $10,000,000.00 ($10.0 million) into the Fund. The amount in the Patient Benefit Fund will be used to pay "J" Lead related claims.

Five Categories of Qualified Settlement Class Members was established for the purposes of the Patient Benefit Fund with each member scheduled to receive different compensation as a subgroup. The 1998 categories and plan of allocation of payments from the Patient Benefit Fund was set as follows:

(1) Category 1 shall consist of Qualified Settlement Class Members with "J" Leads still implanted in their body at

the time of final approval. Category 1 Qualified Settlement Class Members filing a timely claim shall receive $500.00, and be entitled to receive reimbursement out of the Patient Benefit Fund for unreimbursed medical expenses relating to fluoroscopies. To receive payment, a Category 1 Qualified Settlement Class Member must file a proof of claim with the Settlement Master within sixty (60) days after Final Approval. The spouses of each Category 1 Qualified Settlement Class Member who was married as of the date of the Final Approval shall receive $100.00.

Any Category 1 Qualified Settlement Class Member who waives his or her right to receive the $500.00 because of his or her failure to file a timely proof of claim will nonetheless be entitled to participate in the medical monitoring program.

Claims of Category 1 Qualified Settlement Class Members can only be submitted by or on behalf of persons living as of July 22, 1998.

Finally, any Category 1 Qualified Settlement Class Member who fails to file a Proof of Claim to receive a distribution from the Patient Benefit Fund in the time provided for shall have waived his or her right to receive money as a member of Category 1, and the funds that would have been distributed to such class members will be used for Categories 2, 3, 4, or 5 as determined by the Settlement Master.

(2) Category 2 Qualified Settlement Class Members shall receive a payment of $4,500.00 or $10,000.00.[10] Category 2 Qualified Settlement Class Members who have undergone an extraction procedure without minor complications or, an extraction that resulted in a Minor Complication or, who have experienced a fracture and whose Lead (or a portion of their Lead) is still implanted in their body but has not resulted in any complications, shall receive a payment of $4,500. Category 2 Qualified Class Members who experienced a fracture and whose Lead (or a portion of their Lead) is still implanted in their body and has caused a Minor Complication shall receive a payment of $10,000.00.

A Proof of Claim for Category 2 Qualified Settlement Class Members must be filed by March 1, 1999 or within sixty (60) days of Final approval, or within ninety (90) days of discharge from a hospital or a diagnosis of fracture with a recommendation against extraction, whichever is later. Category 2 Qualified Settlement Class Members must also provide verification that the reason for the extraction was directly related to their Lead, or that their Lead is fractured, or that the implanted but fractured Lead caused a Minor Complication. Minor Complications include but are not limited to, extended procedure time, some discomfort to the patient, or other minor complication as may be determined by the [Settlement] Master. The spouse of each Category 2 Qualified Settlement Class Member who was married as of the date of the Final Approval and remained married at the time the claim arose shall receive a payment of $250.00.

(3) Category 3 Qualified Settlement Class Members who have experienced

---

**10.** The Court notes that while the term "or" is stated in the language of the Settlement Agreement in regards to the award amount a particular member of a category can receive, the term is an actual indication of the range that the Settlement Master may, in her discretion, recommend to be paid to the Qualified Settlement Class Member. Moreover, the Parties stipulated that the Settlement Master shall have the discretion to recommend to the Court a payment within the ranges established in Categories 2–5 where appropriate. *See* (doc. 654 at subsection (y)).

a Major Complication shall receive payment of $20,000.00 or $40,000.00, depending upon satisfaction of the following criteria: in order to establish a Major Complication and be entitled to receive $40,000.00, a Category 3 Qualified Settlement Class Member must file a Proof of Claim with the Master by March 1, 1999, or within sixty (60) days of Final Approval, or within ninety (90) days of discharge from the hospital, whichever is later, provided that it is established that he or she has undergone an extraction procedure which resulted in either: (a) a thoracotomy; (b) cardiac arrest; (c) four (4) of sixteen (16) complications that may result;[11] or (d) establishes that the Lead is still implanted in his or her body, but is fractured and the fracture has resulted in four of sixteen specific complications.[12] To be entitled to payment, a Category 3 Qualified Settlement Class Member must be able to verify the complications directly related to his or her Lead with medical records and a notarized statement from the Qualified Settlement Class Member's treating physician.

In order to establish a Major Complication, and be entitled to receive $20,000.00, a Category 3 Qualified Class Settlement Members must file a claim with the [Settlement] Master by March 1, 1999 or within sixty (60) days of Final Approval, or within ninety (90) days of discharge from the hospital, whichever is later, provided that it is established that he or she experienced three (3) of the sixteen (16) complications specifically listed and that the complications are directly related to his or her Lead, as documented by their medical records and a notarized statement from the Qualified Settlement Class Member's treating physician.

Finally, each spouse of a Category 3 Qualified Settlement Class Member who was married as of the date of Final Approval and remained married at the time the claim arose shall receive payment of $500.00.

(4) Category 4 Qualified Settlement Class Members who are Permanently and Totally Disabled, and whose Permanent and Total Disability is directly related to their Lead, shall receive $100,000.00, plus lost income calculated as the sum of (I) a percentage of the "adjusted current annual income"[13] equal to the number of days from the

---

11. The complications include: (1) hospitalization in an intensive care unit for more than 24 hours; (2) additional surgical intervention; (3) permanent injuries proximately resulting from extraction; (4) subsequent infection that resulted in medical attention; (5) a hospital stay longer than four days; (6) cardiac tamponade; (7) vascular injury (tears, thrombi, emboli, valvular damage; (8) pericardial effusion; (9) myocardial perforation; (10) hemothorax; (11) pneumothorax; (12) blood transfusion; (13) systematic infection; (14) an extraction on an emergency or expedited basis as a result of a fracture of their Lead; (15) attempts to extract the recipient's Lead that were unsuccessful; or (16) extensive additional medical care or intervention.

12. *See id.*

13. "Adjusted current annual income" means 78.5% (which percentage is calculated to reflect fringe benefits as well as personal maintenance expenditures) of the Qualified Settlement Class Member's average actual income from wages, salaries, personal services, personal business activities or other form of income from self employment, as reported on his or her federal income tax return over the three years prior to the year of Permanent and Total Disability. If the Qualified Settlement Class Member has no such income or is age 62 or older at the time of permanent disability, then there is no payment under this component of the formula. (*See* Second Submission of Amended Summary Plan of Allocation, doc. 654 at 6).

date of Permanent and Total Disability to the end of the year divided by 365, and (ii) the present value of future "adjusted current annual income" beginning the year following the Permanent and Total Disability, ending the year of the Qualified Settlement Class Member's 62nd birthday and discounted to the year of the Permanent and Total Disability as a net interest rate of 1.5% (which percentage is calculated as the difference between a 5.5% growth and a 7.0% discount rate).

Under Category 4, a Settlement Class Member does not qualify for compensation if he or she was unable to perform the usual duties or activities of Vocation or Self Care prior to the fracture of the Lead, explant of the Lead or attempted or incomplete explant of the Lead.

Also, a spouse of a Category 4 Qualified Settlement Class Member who was married at the time of Final Approval and remained married at the time the claim arose shall receive a payment of $50,000.00.

(5) Category 5 Qualified Settlement Class Members who died as a result of a Lead fracture or as a result of a procedure to extract the Lead shall receive compensation equal to the sum of (a) through (c) below; provided that in no event shall the total payment be less than $200,000.00 or more than $1,000,000.00. In order to establish the cause of death, a Qualified Settlement Class Member's estate must file a Proof of Claim with the Settlement Master by March 1, 1999, or within sixty (60) days of Final Approval, or within ninety (90) days of the death of a Qualified Settlement Class Member, whichever is later, together with either:

(I) the certificate of death indicating the cause of death to be from fractured Lead, cardiac tamponade, complications from an attempted extraction procedure or any other cause related to the fractured Lead; or

(II) a notarized statement from a coroner (or in the case of an extraction-related death, from the extracting surgeon) indicating the cause of death to be any of those enumerated in sub-paragraph (I), *supra.*

Under Category 5, the estate of a Class Member shall be compensated as follows:

(A) $200,000.00;

(B) $200,000.00 multiplied by the number of minor children (under 18 years of age as of the decedent's date of death), if any, that the Qualified Settlement Class Member had at the time of death, plus income, plus $150,000.00 for the spouses.

(C) the Qualified Settlement Class Member's lost income, calculated as the sum of (I) a percentage of the "adjusted current annual income" equal to the number of days from the date of death to the end of the year divided by 365, and (ii) the present value of future "adjusted current annual income" beginning the year following the death, ending the year of the Qualified Settlement Class Member's 62nd birthday and discounted to the year of the death at a net interest rate of 1.5% (which percentage is calculated as the difference between a 5.5% growth and a 7.0% discount rate).[14]

---

14. Under Category 5, the "adjusted current annual income" means 78.5% (which percentage is calculated to reflect fringe benefits as well as personal maintenance expenditures) of the Qualified Settlement Class Member's average actual income from wages, salaries, personal services, personal business activities, or other form of income from self employment, as reported on his or her federal income tax return over the three years prior to the year of death. Further, if the Qualified Settlement Class Member has no such income or is age 62 or older at the time of death, then there is no payment under this component of the formula. (*See* Second

(D) The spouse of any Category 5 Qualified Settlement Class Member, if they are married as of the date of death shall receive a payment of $150,000.00.

We note that "[a] Qualified Settlement Class Member who already filed a claim in one category and later experienced an event that would enable him or her to file a second claim in another category may do so, subject to a reduction in the compensation previously paid out for his or her claim."

In regards to those persons in Categories 1 and 2 above, the First Settlement Agreement called for them to receive the full amount of compensation that they are entitled to after Final Approval of the Settlement. However, in regards to Categories 3 through 5 above, in order to protect the Patient Benefit Fund, the Parties agreed that Qualified Settlement Class Members will receive 50% of the compensation that they are entitled to after Final Approval of the Settlement and the remaining 50% of their award will be held back temporarily (hereinafter, referred to as the "Holdback Provision").

The reason for the Holdback Provision is to allow the Settlement Master, in a period of not more than five (5) years, to make an assessment of the status of the Settlement Class and estimate the number of existing future claims that may reduce the Patient Benefit Funds. Specifically, the First Settlement Agreement states, in pertinent part:

> The [Settlement] Master shall, no later than two (2) years from Final Approval, retain a consultant to assess the status of the Settlement Class, including the number of surviving Class Members implanted with the Lead, the reported J-wire related injuries, Lead extractions, complications from Lead extraction, total and permanent disabilities and

deaths associated with the Lead, to estimate the number of existing and future claims which may reduce the Patient Benefit Fund.

(*See* Second Submission of Amended Summary Plan of Allocation, doc. 654 at 9–10).

Although the PSC may have used its best efforts to allocate the monies in the Patient Benefit Fund to the Qualified Settlement Class Members, the Settlement Master may determine that an adjustment is necessary in the allocation of monies. (*See id.* at 10). Moreover, the Settlement Master, in consultation with the PSC and with approval of the Court, may alter the Plan of Allocation contained in the First Settlement Agreement in order to increase or decrease the total payments to be received by the Qualified Settlement Class Members (*Id.*).

In exercising her best judgment under each circumstance, the Settlement Master shall have the discretion to: (1) determine whether the documentation submitted by the Class Member is sufficient to establish that the Class Member is entitled to receive benefits under the First Settlement Agreement; (2) reallocate the remaining money in the Patient Benefit Fund after all payments are made to the Qualified Settlement Class Members in Categories 1–5 so that additional distributions are made to Categories 2–5, as long as approval is given by the Court; and (3) the process for requesting payment of medical bills and related costs for extractions and fluoroscopies are handled as emergency requests on an expedited basis.

Second, an Operating Fund shall be created by TPLC depositing $10,000,000.00 ($10.0 million) initially, and, ten (10) days after the Final Approval of the Settlement Agreement, depositing the balance of the remaining cash held by TPLC after the establishment of the Patient Benefit Fund

Submission of Amended Summary Plan of Allocation, doc. 654 at 8).

and Litigation Fund. The monies deposited in the Operating Fund will be used by TPLC to pay operating expenses, with the exception of those expenses paid from the Litigation Fund and the Reserve Fund (i.e. the amount necessary to comply with ongoing obligations with the FDA). Any unused portion of the monies in this fund will revert to the Patient Benefit Fund.

Third, a Litigation Fund will be established, into which TPLC will deposit $6,765,528.00 ($6.7 million). The monies in the Litigation Fund will be used by TPLC to pay expenses for other disputes not related to the Models 701 and 801 "J" Leads, which are the subject of this litigation. Any unused portion of the monies in this fund will revert to the Patient Benefit Fund.

Finally, a Reserve Fund will be established, into which TPLC will deposit $4,000,000.00 ($4.0 million). The monies in this fund will be used by the Defendants to pay litigation expenses associated with the 701 and 801 "J" Lead. Any unused portion of the monies in this fund will also revert to the Patient Benefit Fund.

Additionally, in reaching the settlement, the PSC entered into an agreement with the Health Care Financing Administration (hereinafter, the "HCFA"), providing that in consideration of $5,000,000.00 ($5.0 million) being paid by TPLC on behalf of itself and all Medicare beneficiaries in the United States, the United States Government would release and forever discharge them from any and all past, present, and future claims by the United States for expenses relating to medical treatment made necessary by the Leads.

In addition, the Department of Health and Human Services agreed to relinquish all rights to any portion of any judgment, settlement, claim, or collection related to medical expenses pursuant to the terms of the settlement. Thus, the PSC contends that the agreement with HCFA provides a significant benefit to the Class because it protects monies that will be available in the Patient Benefit Fund.

## I. The Sixth Circuit Court of Appeals' First Settlement Reversal

After this Court approved the First Settlement and determined that the Agreement was fair, adequate, reasonable, and in the best interest of the class members as a whole, several members of the class, who previously had sought to intervene, appealed the Court's Order approving the First Settlement, as well as the Order denying those same Objectors the right to intervene.[15]

On February 3, 2000, the Sixth Circuit Court of Appeals held oral arguments in this matter. On July 19, 2000, the Sixth Circuit Court of Appeals reversed this Court's March 5, 1999 Order approving the First Settlement and denying the Intervention as a Matter of Right to the Objectors in this case (doc. 903). See In re Telectronics Pacing Sys., Inc., 221 F.3d 870 (6th Cir.2000)

The Court of Appeals in its Opinion held that this Court abused its discretion when it certified a mandatory, non-opt-out class and approved the First Settlement based on a "limited fund" theory, pursuant to Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure.[16] The Court of Appeals

15. Appellants included class members Harold Reed, *et al.*, Bruce Hopkins, *et al.*, and Charles Badami, *et al.* (collectively known as the "Objectors"), as well as Public Citizens who was then representing Mr. Reed.

16. "A limited fund exists when a fixed asset or piece of property exists in which all class members have a preexisting interest." *In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870, 877 n. 5 (6th Cir.2000). "Classic illustrations include claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, and others." *Id.; see, e.g.,* 1 *Newberg On Class Actions* § 4.09, at 4–33

emphasized that members of a class who bring actions for particularized tort claims for money damages should have an opportunity to opt-out of the class. *In re Telectronics*, 221 F.3d at 881. The appeals court did not reverse the Order of this Court certifying the case as a class action for trial purposes and they also did not reverse our findings that this Court had personal jurisdiction over the Australian companies. *See In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271 (S.D.Ohio 1997) (order certifying class for purposes of trial).

The Sixth Circuit's primary concern was that the First Settlement was not "a true limited fund" and "release[d] ... [Pacific Dunlop and Nucleus] from all liability and le[ft] class members with no recourse against them." *In re Telectronics Pacing Sys., Inc.*, 221 F.3d at 879. The Sixth Circuit summarized its general concerns with mandatory settlements and with special application to this case in the following way:

> From a due process point of view, the opt-out choice is of less concern when there is a definite fund or *res* from which plaintiffs will receive damages. When there is a true limited fund, the only question is how to divide up the pie. Where defendants have sufficient funds to compensate class members through individual litigation, however, as Pacific Dunlop and Nucleus apparently do, the choice to opt-out becomes much more meaningful and due process demands that class members be afforded that right where possible. If certain plaintiffs wish to opt-out and take their chances at suing a foreign corporation, due process would seem to require that they be allowed to do so absent strong

considerations to the contrary not present here.

*Id.* at 881. The Sixth Circuit then remanded the case to this Court.

## J. *The Second Settlement*

After the Sixth Circuit issued its Opinion, the PSC again commenced intense, hard fought, and sometimes "spirited," arms-length negotiations with TPLC and the Australian Companies (doc. 1018). On more than one occasion, the negotiations appeared to reach an impasse. During this process, members of the PSC met with Counsel for the Objectors is an attempt to address their past objections to this Settlement.

In addition, this Court helped facilitate this process by ordering that the previous Objectors/Interveners would be involved in every aspect of the post-appeals litigation, including the submission of briefs, attending all conferences and hearings, and receiving copies of any documents issued by the Court or submitted by the principal Parties to this Litigation.

The Court initially observed that the Parties may be unable to reach an agreement and entered a Third Case Management Order that set an April 2, 2001 trial on the merits date. In the meantime, Counsel for the Parties continued to negotiate a resolution of this case consistent with the decision of the Court of Appeals.

After reaching a preliminary agreement with Defendants, the PSC discussed the terms of the Agreement with Counsel for the previous Objectors who intervened in the appeals. After extensive discussions with Counsel for the Objectors, they indicated that they believed the proposed Set-

(cited in the case of *In re Asbestos Litig.*, 134 F.3d 668, 673 (5th Cir.1998) (Smith, J. dissenting)).

tlement Agreement resolved the concerns that they had with the First Settlement.

The Second Settlement Agreement contains features that resemble the First Settlement in many ways (doc. 1018). We find that the terms of the Second Settlement provide the best means to fairly allocate the settlement proceeds to members of the class. The Second Settlement proceeds are divided into two Funds:

(1) A Patient Benefit Fund in the amount of $58,200,00 which the Settlement Master will use to satisfy all past, present and future claims by any person for product warranty, medical care, injuries, or damages arising from an Accufix Atrial "J" Lead. ARI contributed $52,-2,000,000 to the Fund and Pacific Dunlop/Nucleus contributed $6 million;

(2) A Reserve Fund in the amount of 4.2 million which will be used by the Defendants to pay expenses, judgments and settlement of "J" Lead related litigation. Any money unused in the Reserve Fund reverts to the Patient Benefit Fund. The unused portion of the funds being retained by ARI will also revert to the Patient Benefit Fund.

(doc. 1018).

Additionally, ARI, as part of the First and Second Settlements, reached an agreement with the HCFA, where HCFA, in exchange for a payment of $5 million, relinquished all subrogated interest that the United States Government may have had in the settlement proceeds that individual class members received for past or future payments for explants or fluoroscopies.

## K. *The Second Plan of Allocation*

The Second Settlement provides additional compensation to members of the class. Under the proposed Second Settlement, Category II and III class members will receive more money than they would have received under the First Settlement. In addition, under the new settlement, the

Holdback of funds to Categories 3–5 will only be 25% and will be paid out within one year from the period of Final Approval. *See* Settlement Agreement ¶ 6.15(h).

The amount of compensation is determined by the Category in which the class member falls. Category I class members, those settlement class members who have a working Lead, will receive $500.00. The spouse of a Category I class member will receive $100.00. Additionally, Category I class members may participate in the Medical Monitoring Program. The program will provide on-going fluoroscopic screening opportunities. The Court notes that the amount of reimbursement for Category I class members and spouses have not changed significantly since the First Settlement.

Category II class members are individuals who have undergone a lead extraction. A Category II(a) class member that has not experienced a complication will receive $6,500.00.

A Category II(b) class member who experienced a minor complication will receive $11,500.00. Additionally, the spouse of each Category II qualified member will receive $500.00. The Court notes that the amount of reimbursement paid to Category II(a) and (b) class members and their spouses have increased from a previous claim of $4,500.00, $10,000.00, and $250.00, respectively.

Category III are class members who has experienced major complications. A Category III(a) class member will receive $25,000.00 and a Category III(b) class member who experiences more severe complications will receive $45,000.00 depending on the extent of the complications experienced. Each spouse of a Category III class member will receive $1,000.00. The Court notes that the amount of reimbursement paid to Category III(a) and (b) class members and their spouses have in-

creased from a previous claim of $20,000.00, $40,000.00, and $500.00, respectively.

Category IV class members are individuals who became permanently and totally disabled from a fracture or explantation. Each Category IV class member will receive a minimum payment of $100,000.00. Each spouse of a Category IV class member will receive a payment of $50,000.00. The Court notes that the amount of reimbursement paid to Category IV class members and their spouses have not changed significantly from the First Settlement.

Category V class members are individuals who died from an extraction or a fracture of their Lead. The Estate of a Category V class member will receive between $200,000 and $1 million. Additionally, the spouse of any Category V class member will receive $150,000.00. The Court notes that the amount of reimbursement paid to Category V class members and their spouses have not changed significantly from the First Settlement.

Subsequent to Dr. Hillman's Report, the Parties obtained additional information regarding claims and the experience of class members. Because of health problems, Dr. Hillman has been unable to work with the PSC to evaluate the Second Settlement. Dr. Hillman referred the PSC to one of his colleagues, Atillio Granata, M.D., M.B.A., and Associate Clinical Professor of Medicine at Yale School of Medicine, in order to assist the PSC in evaluating the adequacy of the Second Plan of Allocation (doc. 1015).

Dr. Granata, using the same modeling techniques as Dr. Hillman, updated Dr. Hillman's analysis and concluded that the Second Settlement proceeds are sufficient to satisfy the Second Plan of Allocation.

Dr. Granata's Report has been filed with this Court and was discussed by the Parties during the February 15, 2001 Hearing (doc. 1015).

Under Paragraph 6.1.5(i) of the Second Settlement Agreement, the Settlement Master can propose necessary adjustments to the Second Plan of Allocation. The Second Settlement Agreement further provides that a class member may submit future claims if his or her Lead causes additional injury. The Settlement Master, however, will deduct previous payments to the class member.

## L. The Preliminary Approval of the Second Settlement Agreement.

In this case, the Court held a hearing on November 20, 2000. After reviewing the Joint Motion of the Parties and the supporting materials (doc. 963), this Court entered an Order preliminarily approving this Second Settlement (doc. 964).

## M. Notice to the Class

At the same time, the Court approved the form and substance of the Notice Materials proposed by the Parties. The Court found that "[d]issemination of the class notice in substantially the form set forth in the Joint Motion for Class Certification and attachments constitutes the best notice practicable under the circumstances, and satisfies the requirements of due process and Federal Rule of Civil Procedure 23" (docs. 963 & 964).

We find that the Notice Materials comport with the requirements of Rule 23 and due process (doc. 1021).[17] On or about December 12, 2000, Notice was provided to: all class members at the address on the records maintained by the Settlement

---

17. The Notice campaign is essentially similar to the form and Notice Materials that this Court previously approved on two occasions.

See February 2, 1998 Order (doc. 500); see also In re Telectronics Pacing Sys., Inc., 186 F.R.D. at 465–66.

Master that identified the registered recipients of the Accufix Leads; all class members and/or their counsel who have filed actions against Teletronics, or Teletronics and any other entity or person asserting claims relating to the Accufix Leads; all class members and/or their counsel who have contacted the PSC; all class members who have contacted the Settlement Master regarding the First Settlement in this matter; and all class members who have contacted the Medic Alert Foundation International.

Moreover, the PSC caused a press release to be circulated, through the *P.R. Newswire*, that advised the general public of the certification of a class action and preliminarily approved settlement, and advised class members how they could obtain a copy of the notice. Finally, a summary notice was published on two occasions in the national edition of *USA Today*.

## II. DISCUSSION

### A. *Historical Analysis of Federal Rule 23*

Historically, the class action principle finds its roots in the Bill of Peace, created by the English Court of Chancery. *See* 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 1751 at 7 (1986). Bills of Peace were primarily used as a rule of convenience. In disputes involving common questions of law and fact and multiple parties whereby joinder was impracticable, the English court would facilitate the adjudication by allowing a minute number of individuals to serve as representatives of the group's common interests. *Id.* at 8.

The resulting judgment was binding on all members of the group regardless of whether they were present in the action or not. *Id.* (citing *Adair v. New River Co.*, Ct. Ch. 1805, 11 Ves. Jr. 429, 32 Eng. Rep. 1153); *see also* 1 H. Newberg and Alba Conte, *Newberg on Class Actions*, §§ 1.09 (3d ed.1992); 1 J. Pomeroy, *Equity Jurisprudence*, §§ 252, 253 (1918); Chafee, *Bills of Peace with Multiple Parties*, 45 Harv. L.Rev. 1297 (1932).[18]

In 1842, the Bill of Peace found its way into the legal system of the United States through the promulgation of Equity Rule 48. Rule 48 recognized representative class action-type suits where the parties on either side of the dispute were too numerous to be conveniently brought before the court. However, contrary to the Bill of Peace, Rule 48 did not bind absent parties to the resulting judgments.

Essentially, Rule 48 provided the courts with a convenient device to maintain class action-type suits, while at the same time insure that the interests of all of the members of the class—both present and absent—were properly protected. *Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 302–303, 14 L.Ed. 942 (1853). Federal courts applied Equity Rule 48 from 1842 to 1912.

In 1912, Federal Equity Rule 38 ushered in a revision to Rule 48 of the Federal Equity Rules. Like Equity Rule 48, Rule 38 allowed representative class action-type suits. However, in contrast to Equity Rule 48, Rule 38 established that absent parties could be bound by subsequent judgments pursuant to this rule. *Supreme Tribe of Ben–Hur v. Cauble*, 255 U.S. 356, 363–64, 41 S.Ct. 338, 65 L.Ed. 673 (1921); 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 1751 at 13.

---

**18.** *See also Hom v. Tenants of Bromsgrove*, 22 Eng. Rep. 277 (Ch. 1681); *Brown v. Vermu-* *den*, 22 Eng. Rep. 802 (Ch. 1676).

## B. Rule 23 of the Federal Rules of Civil Procedure; In General.

In 1938, Rule 23 of the Federal Rules of Civil Procedure emerged, dividing class actions into three categories: (1) spurious; (2) true; and (3) hybrid actions.[19] In 1966, an amendment to Rule 23 repudiated the categorical scheme and set forth clear prerequisites to Rule 23(a) and three categories that the class action must fall within under 23(b). 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 1752 at 44.

Of the 3 categories under 23(b), only 23(b)(3) allows the litigants the option to opt out of pursuing their claims in a unified proceeding merely because their claims share legal and factual allegations. *See* Fed.R.Civ.P. 23(b)(3). Thus, we note that, in examining the evolution of the class action procedural device from the English Chancery courts' application of the Bill of Peace through the Advisory Committee's development of Rule 23(b) in 1966, we find that historically only 23(b)(3) provided a litigant the right to opt-out, not 23(b)(1) or (b)(2).

With that historical information in mind, we note that Rule 23(a) provides, in pertinent part:

One or more members of a class may sue ... only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the represen-

tative parties will fairly and adequately protect the interest of the class.

*Id.*

## C. Rule 23(b)(1)(B); "The Limited Fund Theory."

Rule 23(b)(1)(B) provides for a mandatory class as follows:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: (1) the prosecution of separate actions by or against individual members of the class would create a risk of ... (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Except for Rule 23(b)(1)(B) limited fund, mandatory class actions, Rule 23(c)(2) provides, in the case of class action suits, for damages notice to the class and opt-outs as follows:

In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member from the class if the member so requests by a specific date....

*Id.*

## D. The Appellate Reversal of the First Settlement.

In the case of *In re Telectronics Pacing Sys., Inc.*, the Sixth Circuit heard the ap-

**19.** We note the fact that three categories, which were created within Rule 23, only created problems in the courts trying to 'pigeonhole the facts of any one case into one of the three categories. 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 1751 at 16. Furthermore, it was not clear whether the categorical label made any difference as to how 'the Rule was to be applied. *Id.*

peal of several Objectors to the First Settlement from this District Court's Order certifying, on a "limited fund" rationale, a non-opt-out class and approving a class action settlement of $57 million, pursuant to Federal Rule of Civil Procedure 23(b)(1)(B). *Id.,* 221 F.3d 870, 873 (6th Cir.2000). The District Court had relied on the Fifth Circuit Court of Appeals' decision that the United States Supreme Court later reversed in *Ortiz. See Flanagan v. Ahearn (In re Asbestos Litig.),* 134 F.3d 668 (5th Cir.1998), *rev'd, Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

The members of the class who chose to object to the First Settlement raised essentially five issues on appeal:

(1) whether the district court abused its discretion in certifying the class as a "limited fund" class action under Federal Rule of Civil Procedure 23(b)(1)(B) where solvent and potentially liable companies were released from liability; (2) whether the settlement and certification violates due process because it does not allow plaintiffs with claims for money damages to opt-out of the settlement; (3) whether the class representatives and class counsel adequately represented the interests of all class members; (4) whether the district court erred in awarding class counsel fees of 28% of the total settlement fund' and (5) whether the district court abused its discretion in denying the motions to intervene by various class members/objectors.

*In re Telectronics Pacing Sys., Inc.,* 221 F.3d 870, 876 (6th Cir.2000).

The Sixth Circuit ultimately concluded that the "Supreme Court's opinion in *Ortiz,* reversing the Fifth Circuit in the case of *Flanagan v. Ahearn (In re Asbestos Litig.),* required that the mandatory Rule 23(b)(1)(B) class certified by the district court here must be decertified, and that the settlement approved by the district

court must be disapproved." *Id.* at 873. Specifically, the Court of Appeals reasoned that:

[o]ne of the problems with compromising the rights of absent class members under Rule 23(b)(1)(B) through global mass tort settlements distributed on a mandatory basis arises from the perverse set of incentives it may provide defendants and class action lawyers— 'the potential for gigantic fees.' The defendants may be able to settle cases by providing, relatively speaking, a small amount of money for seriously injured class members while providing large attorney fees for lawyers for the class as an inducement to settlement. If the court deviates very far from the traditional or strict limited fund theory by allowing a limited fund to be created purely by settlement, the legal system runs the risk of eliminating adversary trials conducted to redress wrongs individually by actual plaintiffs through a process by which defendants pay off a small group of plaintiffs' class action lawyers who actually represent other parties.

*Id.* at 873–74.

The Court of Appeals further explained that it could not approve a settlement that releases the parent Australian companies from all liability and leaves class members with no recourse against them. *Id.* at 879. It is important to note that the Sixth Circuit's holding in this case did not affect the other findings of this Court in previous Orders, such as: (1) the class certifications based on different theories of liability; (2) the findings of personal jurisdiction against the Australian companies; and (3) the award of adequate attorney fees, expenses; class representative awards, which subject will be specifically addressed by this Court in a separate Order.

### E. Rule 23(b)(3); "The Mass Tort and Opt-out Theory."

Rules 23(b)(3) and 23(c)(2) of the Federal Rules of Civil Procedure provides, in pertinent part:

(b) Class Action Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(3) the court finds that the questions of law or facts common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

\* \* \* \* \* \*

(c)(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specific date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

Fed.R.Civ.P. 23(b)(3) and (c)(2).

Having previously considered the factors of numerosity, commonality, typicality and adequacy of representation under Rule 23(a) and concluding that the Class could be certified against TPLC, *In re Telectronics Sys. Inc.*, 172 F.R.D. 271 (S.D.Ohio 1997), and PDL and Nucleus for the purpose of determining parental liability, *In re Teletronics Pacing Sys., Inc.*, No. MDL–1057, slip op. at 3 (S.D.Ohio Dec. 18, 1997), we need not review the issue of the factors under Rule 23(a) being satisfied in this case. Our task is to determine whether certification of this Class, pursuant to Rule 23(b)(3), is appropriate in this case.

### F. Jurisdictional Concerns In Regards to the Australian Defendants

Even if individual actions against TPLC were successful, we believe that the maintenance and enforcement of actions against Nucleus Limited and PDL may be difficult, if not impossible.

First, the summary jury trial made evident that, even though TPLC faces significant liability in litigating individual cases against it on the theories of strict liability, negligence, and negligence *per se*, the Australian Defendants apparently do not face the same risks on the theories of agency and alter ego.

Although we believe that it would be inappropriate to prejudge the issues surrounding this case, this Court continues to believe, as we indicated in our April 2, 1997 Order Granting In Part Plaintiffs' Renewed Motion for Class Certification that, even though Plaintiffs also sued PDL and Nucleus as TPLC's parent companies, "there is a substantial question whether Pacific Dunlop or Nucleus can be held liable for the activities of their subsidiary, TPLC" (doc. 370). *In re Telectronics Pac-*

*ing Systems, Inc.*, 172 F.R.D. 271, 286 n. 10 (S.D.Ohio 1997). At the summary jury trial, the evidence supporting the exercise of personal jurisdiction over the Australian Defendants was equivocal at best.

Consequently, we believe that there would be a serious question of whether the Court had jurisdiction over the Australian Defendants at trial. We note other courts have already held that they did not have personal jurisdiction over the Australian Defendants for the purposes of this litigation. *See Nolen v. TPLC, Inc.*, No. CV–96–216, slip op. at 3–4 (Circuit Ct. Taladega Cty., Ala. Jan. 10, 1997) (dismissing PDL based on lack of personal jurisdiction); *see also Poe v. TPLC, Inc.*, CV 96–224, slip op. at 2–4 (Circuit Ct. St. Claire Cty., Ala. Aug. 8, 1997) (same).

Furthermore, as we stated earlier, the summary jury findings re-emphasized that, even if the jurisdictional issue was favorable for the class, PDL and Nucleus stood a good chance of success on the claims of liability under the theories of alter ego and agency. Nonetheless, while the actions were pending to determine the question of jurisdiction over PDL and Nucleus, the available assets of TPLC would also be depleted in this case.

The time and costs to the individual class members in litigating their actions against the Australian Defendants in Australia may be significant, if not unfeasible altogether. We cannot overlook the fact that the average age of the class is 77.5. Coupling this fact with the extensive time that may be required to litigate each case only increases the likelihood that a large number of class members would not see and enjoy any award even if successful.

Additionally, the out-of-pocket costs for some class members will be tremendous. Apparently, the PSC conducted over seventy-five (75) discovery and evidence depositions throughout the United States and Australia and were required to analyze hundreds of thousands of documents received through discovery, just to bring this matter through a five-day summary jury trial.

## G. *The Fairness Issues in Regards to Federal Rule 23(e).*

■ Rule 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court...." Fed.R.Civ.P. 23(e). Although Rule 23(e) is silent as to the standard courts should apply to approve or disapprove a proposed settlement, *Parker v. Anderson*, 667 F.2d 1204, 1208 (5th Cir. 1982), the standard developed by the courts is to determine whether the proposed "settlement is fair, adequate, and reasonable under the circumstances, as well as consistent with public interests", and whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than if pursued to a verdict by a jury. *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir.1990); *In re Rio Hair Naturalizer Prod. Litig.*, No. MDL 1055, 1996 WL 780512, at *9 n. 11 (E.D.Mich. Dec.20, 1996) (citing Manual for Complex Litigation, § 30.42 (3d ed.1995)).

■ The court cannot modify the proposed settlement, but must approve or disapprove the proposed settlement as a whole in relation to all of those concerned. *See Evans v. Jeff D.*, 475 U.S. 717, 727, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986); *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 965 (3rd Cir.1983); *In re Rio Hair Naturalizer Prod. Litig.*, 1996 WL 780512, at *9 n. 11 ("The touchstone for final approval is the effect on the class 'as a whole' in light of the particular circumstances....").

■ Being a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement. *In re*

*Southern Ohio Correctional Facility,* 173 F.R.D. 205, 211 (S.D.Ohio 1997); *see also In re Rio Hair Naturalizer Prod. Litig.,* 1996 WL 780512 at *11; *Parker,* 667 F.2d at 1209; *Manual for Complex Litigation,* § 30.42 (3d ed.1995). Consequently, those objecting to the proposed settlement have a heavy burden of proving the unreasonableness of the settlement. *In re Southern Ohio Correctional Facility,* 173 F.R.D. at 211.

When determining whether the proposed settlement is fair adequate, and reasonable, this Court takes into account several factors:

(1) the plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in settlement;

(2) the complexity, expense and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the judgment of experienced trial counsel;

(5) the nature of the negotiations;

(6) the objections raised by the class members; and

(7) the public interest.

*Id.* at 212. Examining each of these factors, we believe that the settlement is fair, adequate, and reasonable in regards to the interests of the Class as a whole.

## H. *Overview of the Fairness Factors*

The Second Settlement brings to a close protracted litigation involving pacemaker leads, Model Nos. 329–701 and 330–801. This Agreement was concluded after extensive, arms-length negotiation, a substantial amount of discovery was conducted by both sides, and a week-long summary jury trial. The Second Settlement

addresses the concerns raised by the Sixth Circuit when that court rejected the First Settlement.

The present Settlement allows TPLC Holdings Inc. and Accufix Research Institute to continue to meet their regulatory obligations and to manage potential future litigation against it, while still devoting substantially all of ARI's remaining assets to the Second Settlement (doc. 1016).

The principal difference between the two Settlements in this case is the present Settlement's opt-out structure which allows unsatisfied class members to exclude themselves from the Second Settlement (doc. 1016).[20] Thus, although class members who exclude themselves from the Second Settlement will be unable to recover under the terms of the Agreement, they do obtain the freedom to pursue individual litigation should they choose to. This change in class structure addresses the Sixth Circuit's concern that class members be given the right to opt-out of a settlement of this kind.

The Second Settlement in this case represents a considered decision by all of the Parties to the litigation that, the interests of all were best served by a negotiated resolution of the claims in this case. The Parties, anticipating the potential for adjustments to the proposed allocation of funds to the class members, on an individual basis, requested that the Court appoint a Settlement Master who would have ultimate responsibility over the Settlement Funds, and who will have authority to make adjustments to the anticipated allocation of Settlement Funds to class members where individual cases merit adjustment. The Court, of course, retains ultimate control over any disbursements

---

**20.** ARI, has, however, agreed to an extended period in which implantees who may have previously opted-out of the class Settlement, but who have reconsidered their decision to exclude themselves, may revoke their exclusion and, in effect, opt back in to the Settlement. The Court commends ARI for its actions in this regard.

to class members, thus ensuring the fairness of the process.

## I. *Examination of the Specific Merits of the Second Settlement.*

### 1. *The plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement*

It is by no means clear that ARI would have lost in the class litigation. Were the litigation to have continued, and were ARI to have prevailed as to either some or all of the plaintiff class, the class as a whole may have lost any ability to recover against ARI. In addition, were ARI to have continued to contest this litigation, regardless of the final outcome, defense costs would likely have depleted its available resources to such an extent that a substantial number of class members would have been unlikely to recover damages, even were they successful in establishing liability against ARI.

Although the summary jury found ARI liable for injuries to class members whose Leads had fractured and caused injury, they also found that class members whose Leads had not fractured, and where no injury had occurred, should not recover.

The summary jury's findings were consistent with judicial decisions involving other intra-cardiac medical devices around the country. *See, e.g., Angus v. Shiley, Inc.,* 989 F.2d 142 (3rd Cir.1993); *Pryor v. Shiley, Inc.,* 916 F.2d 716, 1990 WL 159582 (9th Cir.1990) (unpublished opinion); *Taylor v. Medtronics, Inc.,* 861 F.2d 980 (6th Cir.1988); *Walus v. Pfizer, Inc.,* 812 F.Supp. 41 (D.N.J.1993); *Lauterbach v. Shiley, Inc.,* 1991 WL 148137 (S.D.Tex. Mar.29, 1991); *Sill v. Shiley, Inc.,* 735 F.Supp. 337 (W.D.Mo.1989), *aff'd without op.,* 909 F.2d 508 (8th Cir.1990); *Brinkman v. Shiley, Inc.,* 732 F.Supp. 33 (M.D.Pa.), *aff'd,* 902 F.2d 1558, 1989 WL 202151 (3rd Cir.1989); *Kent v. Shiley, Inc.,* 1989 WL 88307 (D.Ore. Jan. 24, 1989); *Rall v. Medtronic, Inc.,* 1986 WL 22271 (D.Nev. Oct.15, 1986); *Pfizer, Inc. v. Farsian,* 682 So.2d 405 (Ala.1996); *Spuhl v. Shiley, Inc.,* 795 S.W.2d 573 (Mo.App. 1990); *Martin v. Edwards Laboratories,* 60 N.Y.2d 417, 469 N.Y.S.2d 923, 457 N.E.2d 1150 (1983).

The summary jury trial served as a strong indication of Plaintiffs' limited success if this case would proceed to trial. While the summary jury found liability against TPLC on the bases of strict liability, negligence, or negligence *per se,* it did not find PDL and Nucleus liable on the grounds of alter ego and agency.

Furthermore, the PSC has entered into an agreement with HCFA for the release of all past, present, and future claims by the United States Government for expenses related to medical treatment made necessary by the "J" Leads. The settlement ensures that members of the Class can receive continued medical monitoring, namely fluoroscopies.

Therefore, when balanced against one another, we believe that Plaintiffs' likelihood of limited success on the merits is outweighed by the form and relief the PSC has made available through its negotiations. Continuing this litigation will only delay benefits to the Class while further depleting the remaining assets of TPLC. In light of the unique circumstances of this case and the findings of the summary jury, we believe that the benefits to the class as a whole far outweigh the chances of ultimate success on the merits, and thus this factor demonstrates that the settlement is fair, adequate, and reasonable.

Moreover, a substantial number of the plaintiff class members have Leads which have shown no sign of fracture, are working properly, and have not resulted in any injury or complication (doc. 1016). ARI

had already filed the necessary motions to test the viability of the claims of class members who had Leads presently implanted that had not experienced fracture, complication, or injury prior to the First Settlement (*see* doc. 84).

Although the Court denied all pending motions as moot when we granted preliminary approval of the First and Second Settlements, had this case proceeded in litigation, ARI would have likely requested a ruling on its motion to dismiss, and, if successful, would have filed a class-wide motion to dismiss the claims of all class members with such Leads. This would, if successful, have prevented all members of the medical monitoring subclasses from recovering anything against ARI.[21]

In addition, ARI had available to it several affirmative defenses to the class claims of strict liability and negligence, for example, individual causation defenses and the application of the "learned intermediary" doctrine (doc. 1016). Although it is unnecessary to analyze the relative strengths of ARI's defenses, it is by no means clear that the plaintiff-class would have prevailed, either in the class trial or in the individual "mini-trials" which would, as a result of the class certified by the Court, have occurred after a class verdict favorable to the class.

As with the medical monitoring class, therefore, class Counsel had to weigh the danger of failing to recover anything through litigation against the certainty of being able to apply substantially all of ARI's assets, as well as a substantial contribution to the settlement from PDL, to the benefit of the class as a whole.

It is important to note that ARI is no longer generating income, has no further insurance proceeds available to it for Lead-related claims, and, therefore, has a limited fund of money available for claims. Had this case proceeded further in litigation, the defense cost alone would have been such that only a limited number of class members—if any—would have been able, as a practical matter, to recover any damages awards levied against ARI, even were they successful in establishing ARI's liability. The plaintiff class, therefore, faced a substantial risk of failing to recover anything, regardless of the results of the litigation, were they to proceed with their case against ARI.

Even though the Parties are not seeking certification of a limited fund class action pursuant to the provisions of Rule 23(b)(1)(B), the substantial risk that many class members would have been unable to recover against ARI cannot be discounted in making the determination of the present settlement's fairness, reasonableness, and adequacy.

Other than litigation, the only other avenue available to ARI was to seek protection under the bankruptcy code. This alternative would have prevented class members from commencing or continuing litigation against ARI during the period of insolvency (doc. 1016). Title 11 U.S.C. § 362. Although ARI would likely have been unable to use its assets to continue to meet its regulatory obligations, the automatic stay in bankruptcy would, as a practical matter, have precluded a substantial number of class members from recovering damages, as well as the significant admin-

---

**21.** Notwithstanding this result, ARI asserts that it was committed to providing appropriate information regarding patient management guidelines to both patients and health care providers. ARI's further asserts that its commitment to pay for reasonable unreimbursed medical expenses, and to continue its program of research and notification into Leads related issues, would have likely continued regardless of whether or not it succeeded in its efforts to establish that it had no liability for medical monitoring of the class (doc. 1016).

istrative costs involved in typical bankruptcy litigations.

Indeed, even if ARI had not remained in insolvency for the remainder of its corporate existence, the average age of the Lead population, 77.5 years, is such that it is likely that many class members would have been unable ever to assert their claims in person against ARI.

Given that Pacific Dunlop and Nucleus are Australian companies, the judgment and enforcement issues in the event of an adverse judgment against these companies also counsel in favor of settlement. *See Berlinsky v. Alcatel Alsthom Compagnie Generale D'Electricite,* 964 F.Supp. 754, 755 (S.D.N.Y.1997) (In reviewing the "numerous obstacles to recovery which make the decision to settle a reasonable one," the court focused on the judgment enforcement, jurisdictional, and cost impediments to litigating a class action against a foreign company.).

In view of the plaintiff-class's uphill struggle of obtaining an enforceable and collectible judgment against Pacific Dunlop and/or Nucleus, the contribution of the Defendants as part of this Second Settlement is fair, adequate, and reasonable. *See DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1177 (8th Cir.1995) ("[c]ounseling strongly in favor of the settlement is the fact that the plaintiffs did not have a very strong case . . ."), *cert. denied,* 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 648 (1996). In this regard, the conclusion of the summary jury in regards to no liability against the Australian companies cannot be ignored. *See In re Southern Ohio Correctional Facility,* 173 F.R.D. at 213.

The real risk that Pacific Dunlop and Nucleus are not subject to personal jurisdiction supports this settlement as fair, adequate, and reasonable. Absent settlement, Pacific Dunlop and Nucleus will likely file additional summary judgment motions on the jurisdictional issues and force

class members to present substantive evidence which establishes that the exercise of personal jurisdiction comports with due process. *See Sanders v. Robinson Humphrey/American Express, Inc.,* No. CIV. A.1:85–CV–172RLV, 1990 WL 105894, at *3 (N.D.Ga. May 23, 1990) (The fact that "[m]any potentially dispositive threshold issues might bar recovery by Class members" weighs heavily in favor of settlement.); *see also Eltman v. Grandma Lee's, Inc.,* No. 82 CIV.1912, 1986 WL 53400, at *5, *7 (E.D.N.Y. May 28, 1986) (finding impediments to personal jurisdiction weighing in favor of class action settlement).

Similarly, lack of personal jurisdiction will remain as an affirmative defense and further hurdle at any trial. The elimination of that risk through this settlement should not be overlooked, and supports the settlement as fair, adequate, and reasonable. The Court had made a prima facie finding that there was evidence to support this Court's personal jurisdiction over the Australian Defendants, but we also concluded that the jurisdictional issue could also be litigated as an affirmative defense in the summary jury trial and any trial on the merits.

During the summary jury trial, Plaintiffs could not establish that Teletronics acted as an agent of Pacific Dunlop in connection with the Accufix Leads. The Plaintiffs simply could not demonstrate that the development, manufacture, sale, and distribution of the Accufix Leads was actually the business of Pacific Dunlop that Teletronics agreed to conduct for the real benefit of, and under the complete control of, Pacific Dunlop. *See* Summary Jury Instructions at 87–88.

Equally daunting, the Plaintiffs could not identify record facts demonstrating that Nucleus exercised such overarching and exclusive domination of Teletronics

that Nucleus, in essence, took charge of Teletronics' business to the point that Teletronics had no separate mind, will, or existence. *See* Summary Jury Instructions at 72.

Moreover, there was insufficient evidence that suggested Nucleus established Teletronics specifically to avoid a known liability, or used Teletronics to defend a crime, evade a law, justify a wrong, or engage in some other unjust or wrongful conduct. *See* Summary Judgment Instructions at 73. The Plaintiffs' claim could fail again at a another trial on the merits and that risk weighs heavily in favor of settlement (doc. 1021).

### 2. The complexity, expense and likely duration of the litigation.

This settlement also serves the laudable goal of eliminating the costs and time attendant to continued litigation (doc. 1021). *See Weinberger v. Kendrick,* 698 F.2d 61, 73 (2nd Cir.1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation."); *In re Sunrise Sec. Litig.,* 131 F.R.D. 450, 455 (E.D.Pa.1990) (approving a class action settlement because, in part, the settlement "will alleviate ... the extraordinary complexity, expense and likely duration of this litigation").

Generally speaking, "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them." *In re Austrian and German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 174 (S.D.N.Y. 2000). In this case the limited resources of Teletronics, the mature age of the class, and the jurisdictional questions all provide ample justification for the negotiated resolution of this dispute.

Indeed, this Court previously recognized that, through transaction costs alone, Teletronics' "assets will continuously be de-

pleted as each of the individual cases proceeds in its separate litigation." *In re Telectronics Pacing Sys., Inc.,* 186 F.R.D. at 475.

That risk of depletion is certainly relevant to this Court's evaluation of this settlement. *See In re Residential Doors Antitrust Litig.,* No. MDL–1039, 1998 WL 151804, at *6, *8 (E.D.Pa. Apr.2, 1998) (Where there is a risk of insolvency, a "guaranteed recovery" is in the best interest of the class.); *Bello v. Integrated Resources, Inc.,* No. 88 CIV 1214, 1990 WL 200670, at *2 (S.D.N.Y. Dec.4, 1990) ("The strongest argument for approving the settlement is the risk that plaintiffs will be unable to recover even if they are eventually victorious."). The risk of depletion of Teletronics' assets is far from the only risk posed by continued litigation.

Further, this case has been pending for 6 years, and the complex procedural and substantive issues would, if litigated, result in extensive trials and numerous appeals. *See In re Telectronics Pacing Sys., Inc.,* 186 F.R.D. at 477 ("The factual and legal issues in this case are complex."). Although most discovery has been completed, absent a settlement, there would no doubt be substantial time and expense devoted to motion practice, likely appeals from those motions, multiple trial preparations, trials, and appeals from trials. *See In re Residential Doors Antitrust Litig.,* 1998 WL 151804, at *6.

For example, although Pacific Dunlop and Nucleus consented to the certification of the settlement class, *see* Agreement of Compromise and Settlement § 3.1, they maintain that any class certified for trial would be infected with manageability problems and conflict with Rule 23 and the Constitution. *See In re Sumitomo Copper Litig.,* 189 F.R.D. 274, 284 (S.D.N.Y.1999) ("The settlements allow those members of the Class to avoid facing the risk that the

Class might not continue to be certified at trial."); *see also Sanders v. Robinson,* 1990 WL 105894, at *2 (same); *Eltman,* 1986 WL 53400, at *6 (same). These are real risks weighing in favor of settlement.

Protracted litigation also poses an additional, practical risk in this case. *See In re Telectronics Pacing Sys., Inc.,* 186 F.R.D. at 475; *accord In re Austrian and German Bank Holocaust Litig.,* 80 F.Supp.2d at 175 ("Many of the plaintiffs and members of the Settlement Class are advanced in age and prolonging this litigation will result in many of them never seeing a resolution of this action or distribution of any recovery.").

Recognizing the complexities and risks associated with this litigation, this Court observed that "the longer this matter continues is detrimental to the overall class whereby some persons many not receive any award in their lifetimes." *In re Telectronics Pacing Sys., Inc.,* 186 F.R.D. at 477. This case was ripe for a negotiated resolution, and this settlement should be approved.

Without the Settlement before the Court, class members would have been required to engage in complex, expensive, and lengthy litigation with, at best, uncertain prospects for a positive outcome, and the almost certainty that ARI would have insufficient funds to compensate more than a small percentage of those class members who prevailed.

Although it is impossible to predict the pace of litigation with any certainty, an optimistic estimate of the future of this litigation, which has already been pending for 6 years already and assuming that class members prevailed at every stage in the process, would be: class verdict no sooner than June 2001; decision by the Sixth Circuit on ARI's appeal no earlier than June 2002; decision by the Supreme Court on ARI's certiorari petition by no earlier than November 2002; commence-

ment of individual mini-trials no earlier than February 2003; consideration of appellate issues flowing from mini-trials by intermediate level appellate courts no earlier than March 2004; and the consideration of issues by either state or federal Supreme Courts by no earlier than November 2004.

Thus, even assuming the best results for the plaintiff-class, and assuming that the individual discovery process would only take, in some instances, three months, it is highly unlikely that individual class members would be able to even begin recovering individual damages awards until November 2004 at the earliest. During this period, ARI's assets would have been significantly reduced by its legal fees, incurred both in the defense of class litigation and any ongoing state cases, as well as the ongoing costs of maintaining its medical monitoring program and its other regulatory obligations.

### 3. Stage of the proceedings and the amount of discovery completed.

This litigation was initiated in February 1995 (doc. 1). Since that date, more than 500 suits have been filed against Teletronics and a substantial amount of discovery has been taken. Accordingly, sufficient time has elapsed to allow Counsel for the PSC and for the Defendants to analyze the strengths and weaknesses of their own cases as well as those of their opponents.

At the time of the First settlement, the Parties had completed discovery and taken the case through a summary jury trial. The summary jury trial made the Parties aware of the strengths and weaknesses of their respective positions. Apparently, the Parties reached an initial settlement after a thorough investigation and analysis of the facts and legal issues implicated in this case.

Were this case to not settle after successfully negotiating a Second Settlement and Plan of Allocation, ARI would be required to spend substantial amounts of money from its already limited assets in order to continue defending itself. Accordingly, this case has reached a point of diminishing returns, where further litigation would, paradoxically, make it less likely that the class, as a whole, would be able to recover any damages.

The advanced stage of the proceedings and the substantial amount of concluded discovery in this case, means that the Parties have been able to perform a realistic assessment of the factual and legal strengths and weaknesses of the claims and defenses arising from this case, and have also had the chance to assess the limited nature of ARI's financial resources. Accordingly, this Court finds that the Second Settlement was negotiated by the Parties with all of the knowledge necessary to make an intelligent, informed decision in this matter.

### 4. *The judgment of experienced trial counsel.*

On July 14, 1995, the Court appointed Class Counsel. This group of litigators is comprised of the some of the finest Class Counsel in the country, including Attorney Stanley M. Chesley, of the law firm Waite, Schneider, Bayless & Chesley Co.; Daniel E. Becnel, Jr., of the law firm Becnel, Landry & Becnel; R. Eric Kennedy, of the law firm Weisman, Goldberg & Weisman Co.; Thomas D. Rogers, of the law firm Ness Motley Loadholt Richardson & Poole; Roger P. Brosnahan, of the law firm Brosnahan, Joseph, Lockhart & Suggs; Jack Baldwin, of the law firm Baldwin and Baldwin; Arthur Sherman, of the law firm Sherman Salkow Petoyan & Weber; Calvin Fayard, Esq.; Richard S. Wayne, of the law firm Strauss & Troy; Ron Parry, of the law firm Arnzen Parry & Wentz; David J. Guin, of the law firm

Donaldson, Guin & Slate; Elizabeth Cabraser, of the law firm Lieff, Cabraser, Heimann & Berstein; David J. Bershad, of the law firm Milberg Weiss Bershad Hynes & Lerach; Charles Zimmerman, of the law firm Zimmerman Reed; Martis Ann Brachtl, of the law firm Goodkind Labaton Rudoff; Louis F. Gilligan, of the law firm Keating Muething & Klekamp; and, Arnold Levin, of the law firm Levin Fishbein Sedran & Berman.

The PSC has investigated the nature, extent and availability of TPLC's financial resources and has concluded that the proposed settlement and distribution of available funds to class members is a fair and superior alternative to the potential exhaustion of these assets in continued litigation, and to the risk that defense costs, individual settlements and/or a few potentially large judgments would exhaust available assets before other claimants have had an opportunity to be heard (doc. 963).

We find that these attorneys, serving with others as Class Counsel, are extremely qualified and experienced in medical class action litigation. Certainly, Class Counsel's recommendation to approve the settlement is well-informed. The Court heeds the recommendation of such experienced, professional, and competent Counsel.

The Parties have satisfied the standard for a preliminary approval of class certification and settlement (doc. 963). "If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with the range of possible approval, then the Court should direct that notice be given to the class members of a formal fairness hearing, at which evidence may be presented in support of and in opposition to the settle-

ment." *Manual for Complex Litig.* § 30.44 (2d ed.1985). In light of this standard, this Court preliminarily approved this settlement on November 20, 2000 (doc. 964).

Based upon an analysis of the facts underlying the theories of liability asserted against TPLC and its parent and affiliate companies, the law applicable to those theories of liability, the issues of judgment, enforcement and jurisdictional issues, the results of extensive discovery, the summary jury trial and related settlement negotiations in this litigation, the PSC has concluded that a negotiated resolution of all claims made against TPLC, Pacific Dunlop, Nucleus, and other affiliates is the most likely means of providing a substantial benefit to class members and further urges this Court to approve the Second Settlement because Counsel finds it fair, reasonable, adequate, and is in the best interest of the class members.

TPLC, Pacific Dunlop, Nucleus, and affiliates have also concluded that the Second Settlement and Plan of Allocation is fair, adequate, reasonable, and desirable in order to avoid the time and expense of defending protracted litigation, to put the claims concerning the Accufix Leads finally to rest, and also to serve as an appropriate vehicle for the provision of benefits to class members.

### 5. *The nature of the negotiations.*

Nothing in the Second Settlement Agreement, nothing in regards to the conduct of this litigation, from its inception through the summary jury trial, the First settlement, and the present Settlement, can support any inference that this Second Settlement was reached in any way other than by intense, hard fought, and arms-length negotiations.

The Court should always give significant weight to the belief of experienced Counsel that the settlement is in the best interest of the class. *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. 158, 184 (E.D.Pa.1997) (citing *Austin v. Pennsylvania Dep't of Corrections*, 876 F.Supp. 1437, 1472 (E.D.Pa.1995)). Initially, however, the Court should determine whether the settlement was non-collusive and ask was it reached through arms-length negotiations. *Id.*

We conclude that this case has been hard-fought, no stone has been left unturned, and there is simply no evidence suggesting collusion or illegality. *See* Herbert S. Newberg & Alba Conte, *Newberg on Class Actions* § 11.51 (3d ed. 1992) ("[C]ourts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered."). The negotiations that resulted in this proposed settlement were intense and this Second Settlement reflects real concessions from all sides. Particularly apropos is the following observation from another federal court:

> [S]ettlement discussions were not seriously initiated until years of arduous discovery had been completed, and counsel were truly in a position to analyze objectively the strength of plaintiffs' case on the merits, and to balance that strength against the amount offered in settlement and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

*Stull v. Baker*, 410 F.Supp. 1326, 1333 (S.D.N.Y.1976).

Having presided over this litigation for 6 years, as well as the summary jury trial, we conclude that the Second Settlement was reached as a result of hard-fought and intense arms-length negotiations. The negotiations did not reflect or suggest any collusion or illegality.

### 6. *Objections raised by the class members.*

Federal Rule of Civil Procedure 23(e) provides, in relevant part, that "[a] class action shall not be ... compromised without approval of the Court, and ... notice to all members of the class." Court approval protects class members by determining that the settlement is fair. *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 283 (D.Colo.1997).

Following the Entry of the November 20, 2000 Preliminary Approval Order in this case (doc. 964), Amity Unlimited, Inc., Cincinnati, Ohio, was retained by the PSC to send out the Notice Packet to all persons contained on a mailing list that was provided by Settlement Master, Virginia Conlan Whitman (doc. 1014).

In his Affidavit, Robert Janszen of Amity attested that, on December 6, 2000 (doc. 978), his staff began mailing 24,967 copies of the Notice Packet to the class members (doc. 1014, Ex. A). After the Entry of the December 18, 2000 Order of this Court, Mr. Janszen also attest that on the same day as that Order, his staff began mailing a copy of the Supplemental Notice packet to all persons on the mailing list that was provided by Ms. Whitman (doc. 1014, Ex. B.). In a second Affidavit, Phillip T. Hager attested that on December 6, 2000, he mailed the Notice of Class Action and Proposed Settlement, Summary Plan of Allocation and Consequences of opting to the class members as well (doc. 1017, Exs. A–C).

The December 6, 2000 Notice of Class Action and Proposed Settlement (doc. 1017, Ex. A) reads, in pertinent part, as follows:

#### *Opting–Out of the Settlement*

If you do not wish to participate in the Settlement, you must opt-out of, or exclude yourself from, the Settlement. In order to exercise your opt-out right, you must notify the Court, in writing, of your intention to opt-out by Tuesday, January 16, 2001. Your opt-out notification must include your name and your address. An opt-out form has been enclosed for your convenience as Appendix 3 to this Notice. If you use this form, you should complete it and mail it to the court in order to exercise your opt-out right.

#### *FAIRNESS HEARING*

A fairness hearing will be held in Courtroom 838, Potter Stewart United States Courthouse, 100 East Fifth Street, Cincinnati, Ohio 45202 at 10:00 a.m. on Thursday, February 15, 2001, to determine whether class certification is proper, and whether the Settlement is fair, adequate, and reasonable and should be approved by the Court.

At the hearing, any class member may appear in person, or through counsel, and may be heard in support of, or in opposition to, the fairness, reasonableness, and adequacy of the Settlement and on class certification. If you wish to be heard in support of, or in opposition to, Settlement or certification, you must file with the Court and serve on counsel, no later than 5:00 P.M. on January 16, 2001, copies of your intention to appear and/or your written comments or objections....

Any class member who does not timely file and serve an intention to appear or written comments or objections shall be deemed to have waived any and all objections and be foreclosed from objecting (by appearance or otherwise) to the Settlement. Any class member who does not timely file and serve an opt-out notice shall be deemed to have waived his or her right to opt-out of the Settlement, and will be bound by the terms of the Settlement. Any class member who

opts-out of the Settlement will no longer be a class member, and will no longer be represented by Counsel for the Settlement Class. **ANY CLASS MEMBER WHO IS SATISFIED WITH THE PROPOSED SETTLEMENT NEED NOT APPEAR AT THE HEARING OR SUBMIT ANY COMMENTS.**

(doc. 1017, Ex. A at 8, 10–11).

The Court has received numerous letters from Plaintiffs' Counsel representing class representatives reflecting their clients' support of the proposed Settlement of this class action.[22] It is inevitable that some within the class will not agree with the terms of the Second Settlement and the Plan of Allocation, and will protest that they could have recovered more were they allowed to proceed individually.

As the Ninth Circuit has noted, however, "[s]ettlement is the offspring of compromise; the question [a court addresses] is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir.1998). Generally, a diminutive amount of objectors may signify that a settlement is fair. *See Newberg on Class Actions,* § 11.48 (3d ed.1992). Furthermore, the fact that some class members object to the settlement does not by itself prevent a court from approving a settlement. *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 246 (S.D.Ohio 1991).

Although the Court should consider objections to the settlement, the existence of objections does not mean that the settlement is unfair. Indeed, even if a majority of the class is opposed to the settlement, this Court should approve the Second Settlement and Plan of Allocation as long as

we determine that the overall settlement is fair, adequate, and reasonable under the circumstances and as a whole.

Assuming a majority were opposed, it is clear under the applicable law that even 'majority opposition to a settlement cannot serve as an automatic bar to a settlement that a district judge, after weighing all the strengths and weaknesses of a case and the risk of litigation, determines to be manifestly reasonable.'

*County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1325 (2nd Cir.1990) (citations omitted).

After the First Settlement was negotiated and preliminarily approved by this Court in the Fall of 1998, there were over 50 known and named Objectors/Interveners with Counsel to the settlement that the Court was aware of, and many of those Objectors/Interveners participated in the direct appeal to the Sixth Circuit:

Five different groups of class members have appealed the approval of the settlement and their appeals have been consolidated: (1) Unnamed class member-objector Harold Reed (No. 99–3476); (2) Bruce Hopkins, *et al.* (No. 99–3477) is comprised of 67 class members who, prior to the settlement, had filed suit against defendants in the Southern District of New York; (3) Class members-objectors Miriam Beasley, *et al.* (99–3478); (4) Kenneth Adam, *et al.* (No. 99–3479), are objectors, proposed interveners and putative class members from Louisiana who received the defective leads; and (5) Charles Badami, *et al.* (No. 99–3480), also known as the "Colorado Plaintiffs," is comprised of a group of unnamed class member plaintiffs, objectors and proposed interveners who

---

**22.** *See* Letters from C. Brooks Cutter to Richard S. Wayne of 02/13/01 (doc. 1030), Keelyn M. Frisen to Mr. Wayne of 02/14/01 (*Id.*), Alan L. Fuchsberg to Mr. Wayne of 02/14/01, and Patricia Dean to Mr. Wayne of 02/14/01 (*Id.*); *see also* letters from Arthur Sherman to Mr. Wayne of 02/14/01 (doc. 1032).

had cases pending in the District Court for the City and County of Denver that were not made aware of the multi-district litigation and their cases were stayed after the class was certified in the multi-district litigation.

*In re Telectronics Pacing Sys., Inc.,* 221 F.3d 870, 876 (6th Cir.2000).

In the case at bar, this Court issued two Orders on November 20, 2000 authorizing the Parties to notify the class members of the Second Settlement and we further gave a deadline of January 16, 2001 for the opt-out members and objectors to file their written comments (doc. 964 & 965). After the Notice Packets and the Supplemental Notice Packets were directly mailed to some 25,000 class members, as well as the national newspaper notices that ran in *USA TODAY,* the Court received the following written comments from class members filed by the January 16, 2001 deadline: (1) Letter to court from class member Deborah Hickox (doc. 968); (2) Motion by Class Member/Intervener Harold Reed to Expedite Response to Discovery Requests (doc. 983); (3) Motion by Calvin Buggs, Jr. for an Order for Medical Records (doc. 986); (4) Application by Objector Harold Reed for Reasonable Attorney Fees and Expenses Submitted by Liaison Counsel for Reed (doc. 989); (5) Letter to the Court from Sam Watts for Viola Watts to Defendant Teletronics, not able to appear (doc. 994); (6) Applications by Attorneys for Intervener Harold Reed for Award of Attorney Fees and Expenses (doc. 995); (7) Letter to Court from Bennett Feldman Attorney for William Galivan Regarding Concerns (doc. 998); and (8) Notice of Intent to Appear by Attorney Phillip Gunder, Attorney for Sam Robinette, Lisa Baker and Joe Calvert, and Objections to the Settlement Agreement (doc. 999).

The Court received the following written comments from the class members from January 16 to February 15, 2001:(1) Class Member Michelle Ericson's Objections to the Proposed Settlement Terms (doc. 1000); (2) Letter to the Court from Arthur S. Sherman, Attorney for Maxine Fahey, regarding exclusion form, Ms. Fahey sent exclusion form in error (doc. 1002); (3) Motion by Public Citizen for Leave to Participate as *Amicus Curiae* and Notice of its Intent to Appear (docs. 1004 & 1005); (4) Letter to Court from Peter Lockie concerning settlement (doc. 1011); (5) Notice by Bruce Bistline of withdrawal of class members Michelle Ericson's objections to proposed settlement terms (doc. 1012); (6) Motion by Member Calvin Bugg, Jr for Order for Medical Exam and Records (doc. 1022); (7) Memorandum by *Amicus* Public Citizens in opposition for Attorney Fees (doc. 1024); (8) Objections by Movant William Galivan to Settlement Agreement (doc. 1028); (9) Notice of Filing Withdrawal of Objections by William Galivan (doc. 1033); and (10) Objections by Sam Watts Regarding Class Member Viola Watts to Agree with Public Citizens (doc. 1034).

On Thursday, February 15, 2001, this Court held a Fairness Hearing in this matter, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure (doc. 1035). At the very beginning of the Hearing, Lead Counsel for the PSC, Stanley M. Chesley, asserted to the Court that all of the previous Objections to this Settlement Agreement had been resolved, withdrawn, or satisfied, with the exception of *amicus* Public Citizen, and with the possible exception of class member Viola Watts, who had written the Court on the day of the Hearing agreeing with Public Citizens' positions in their opposition memorandum (doc. 1034).[23]

---

**23.** Richard Wayne also asserted to the Court that he would attempt to resolve any objections Ms. Watts had to the settlement. There- fore, the Court is not aware as of the date of this Order, whether or not Ms. Watts objec-

The Court makes note of the fact that, during the entire 5–hour Hearing, there were only two class members who were physically present in the Courtroom and no class members, or objectors, or opt-outs or other non-counsel were present to speak to the Court, even when their opportunity to support/object arrived.

During the Hearing, the following information was provided to the Court from either the Parties or the Settlement Master and was asserted to be current as of the date of the Hearing (*see* doc. 1035):

(1) Out of the more than 25,000 class members, 13,000 members are alive and 12,000 members are now deceased;

(2) Notice was sent on December 6 and 18, 2000, resulting in less than 150 members who are ultimately choosing to opt-out;

(3) The Settlement Master reported that a little more than 6200 claim forms have been received from class members requesting payment from the Settlement Fund, with some of those claims possibly being repeat claim forms that will be sorted by her for a final tally by the June 1, 2001 deadline for receiving claims;

(4) In 1999, the average class member's age was 80 years old, but has decreased to 77.5 years old due to the death of many of the class members in the two years since;

(5) HCFA has already been paid a settlement sum of $5 million in 1998 by Teletronics, with the support of the PSC, for the release of those claims it had for any class member over the age of 70 which Mr. Chesley asserted amounted to a much higher real value for the class as of the year 2001;

(6) The Patient Benefit Fund is presently valued at $58,200,000.00 ($58.2 million) and the Reserve Fund is presently valued at $4,200,000.00 ($4.2 million) for a total present value of $62,400,000.00 ($62.4 million);

(7) The Louisiana claims have been settled for $300,000.00, which according to the PSC's Liasion Counsel Richard Wayne, is only a fraction of what those past Louisiana Objectors had been seeking;

(8) ARI is only in the business of managing this Settlement and maintains an operating fund and a skeletal crew for state/federal agency reporting purposes and to defend any related or unrelated lawsuits;

(9) The Holdback Provision for Class Member Categories 2–5 is now only at 25% for a 1 year period, as opposed to the previous percentage of 50, which is due to the fact that there are far less claims than initially anticipated;

(10) The Settlement Master can increase the Holdback Provision in order to look at all of the individual circumstances;

(11) There is a dispute resolution provision in the Settlement Agreement in order for the Court to resolve class member objections to the amount paid to individual class members;

(12) The lower number of claims in this Settlement allows those class members in Categories 2–5 to receive an increase in their overall expected payments;

(13) Any remaining monies in the Reserve Fund after the Agreement has been fully executed, will revert back to the benefit of the class as a whole; and

(14) The PSC, Defendants, and Plaintiffs' Counsel asserted to the Court that there would only be one lump-sum award for attorney fees, which are to be paid in increments.

---

tions have been satisfied or withdrawn. Nonetheless, since Ms. Watts stated in her filings that she agreed with Public Citizens' positions on this issue, the Court will only make direct note of Public Citizens' Objections to the Second Settlement.

In its *Amicus* Memorandum filed with this Court on January 16, 2001 (doc. 1004), Public Citizen asserted that, up until January 10, 2001, Public Citizen represented class member Harold Reed in this case before this Court in the First Settlement and in the subsequent appeal to the Sixth Circuit, but he has since opted out of this proposed settlement without objection.

Thus, Mr. Reed will not be pursuing additional responses to discovery or objecting to the PSC's fee request. Public Citizen sought leave from this Court to participate in the Fairness Hearing for two reasons (doc. 1004).

First, Public Citizen asserted that it wanted this Court to be aware of the "side deals" that were made between the PSC, Defendants, and Counsel for individual class members so that we can consider the effect of those deals, if any, on the fairness of the settlement (doc. 1004). *See Bowling v. Pfizer, Inc.*, 102 F.3d 777, 781 n. 3 (6th Cir.1996) (fee-sharing agreements reached during negotiation of the settlement "should certainly raise questions at the settlement-approval stage" because of the "risk that counsel in some way have been 'bought off' and provided with a significant incentive not to represent the class's interest").

Furthermore, as the recipient of the interrogatory responses to Mr. Reed's discovery requests, Public Citizen is the only party with access to information about these "side agreements" that is willing to bring them to this Court's attention. Therefore, Public Citizen's participation in the upcoming Fairness Hearing is essential to alert the Court to the existence of side deals and the significance of those deals to the fairness of the new proposed settlement.

Public Citizen also objected to the PSC's fee requests (doc. 1004), but that particular Objection will be addressed in the Court's supplemental Order on Attorney Fees and Expenses.

During the February 15th Hearing, Amanda Frost, Esq. of Public Citizen was the only Objector to the present Settlement who was present, participated, and was willing to address the Court. During the Hearing, Ms. Frost alleged that the following facts presented a serious problem to the Second Settlement and Plan of Allocation and should be reviewed/investigated by this Court prior to any approval of the settlement by us:

(1) Public Citizen brings to this Court's attention several side-deals that should be considered by this Court in determining whether the settlement is fair, adequate, and reasonable;

(2) Public Citizen asserts that it has learned, through discovery and through discussions with lawyers representing class members, that the PSC negotiated an agreement between Defendant TPLC and a group of class members from Louisiana (hereinafter, referred to as the "Adams Objectors") in which TPLC agreed to pay the Adams Objectors $300,000 from the Reserve Fund in return for the Adams Objectors agreement not to opt-out of the class;

(3) Since the new proposed settlement's Reserve Fund will revert to the Patient Benefit Fund, the $300,000 payment depletes the funds available to compensate the rest of the class;

(4) The deal between the Adams Objectors and TPLC is not independent of the new proposed settlement, but rather is a term of the Second Settlement that should have been fully disclosed to all class members and to this Court;

(5) The Adam Objectors have not opted out of the class, indeed, their agreement with TPLC requires that they remain in the class to receive the $300,000 "payoff";

(6) In this case, the Adams Objectors, who originate from a group of Louisiana claimants, were treated differently from all other class members, as they have collectively received $300,000 more than class members with the same injuries;

(7) This Court should seek a detailed explanation from the Adams Objectors and TPLC to justify the special payment and should not approve the settlement unless it is satisfied that the entire class has been treated fairly; and

(8) If the Parties fail to make this Court aware of side deals, the Court might erroneously assume that a low number of objections/objectors indicates that the settlement is fair to all class members, rather than to the fact that those class members savvy enough to hire a lawyer have, in effect, been paid to remain silent.

■ As a preliminary matter, the Court would like to make clear to all concerned, being granted *amicus* standing does not infer the same standing to Public Citizen as a rightful intervener, formal objector, or counsel to a class member. In its filing, Public Citizen readily admits that its sole client in this matter, Harold Reed, has decided, for reasons not fully disclosed to this Court, to opt-out of the Second Settlement, rather than remain as a client of Public Citizen and participate as a class member or Objector.

The Court believes that during the Fairness Hearing, the Court fulfilled its judicial role as protector of the class, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure by addressing the concerns of Public Citizen about certain "side deals" for the Adams Objectors, allowing Counsel for the Adams Objectors and TPLC an opportunity to answer Public Citizen's charges on the record and in open court, inquiring about any "side deals" or special treatment of the Adams Objectors.

After reviewing this matter, the Court is satisfied that, under the facts, circumstances and under law of this case, the Adams Objectors were not given any "special treatment" and no "side deals" were made that prejudiced or injured the class members as a whole for the following reasons.

First, the Settlement that was reached relating to the redhibition claims [24] of certain Louisiana plaintiffs is not a secret agreement and is consistent with the terms of the Settlement. *See* Agreement of Compromise and Settlement, para. 6.3.2. The settlement of these claims has no impact on the Patient Benefit Fund, and it does not affect the fairness of the Second Settlement to the class as a whole.

Second, Public Citizen assumes that ARI did not intend to reveal this agreement to the Court. Yet there is simply no basis for such an assumption. Indeed, under the terms of the settlement, ARI will be required to provide reports regarding expenditures from the Reserve Fund ev-

---

**24.** *Black's Law Dictionary* p. 1149–50 (5th ed.1979) defines the following terms:

(1) Redhibition: Avoidance of sale on account of vice or defect in thing sold which renders it either absolutely useless or its use so inconvenient and imperfect that it may be presumed that buyer would not have purchased it had he known of defects. *Lafleur v. Boyce Machinery Corp.*, —— La.App. ——, 282 So.2d 819, 821.

(2) Redhibitory action: In the civil law, an action for redhibition. An action to avoid a sale on account of some vice or defect in the thing sold, which renders its use impossible, or so inconvenient and imperfect that it must be supposed the buyer would not have purchased it had he known of the vice. Civ.Code La. Art. 2520. An action in which buyer, alleging seller's breach of express or implied warranty, seeks to return thing sold or part thereof and to recover back all or part of price paid. *Hermanos v. Matos*, C.C.A.Puerto Rico, 81 F.2d 930, 931.

*Id.* at 1149–50.

ery six months after the settlement is approved.

Third, Public Citizen seeks to characterize this agreement between the Adams Objectors and TPLC as a "secret payment" for class members "to remain silent" when it is in fact, a payment made in resolution of a claim. ARI's response to Public Citizen's interrogatory was clear on this point:

1. State the amount of money that Objectors' counsel sought for themselves or their clients, if any, or that any of the Settling Parties offered to pay Objectors or Objector's counsel, if any, over and above the terms of the proposed new settlement.

RESPONSE: ARI incorporates the objections stated above as if set forth in full herein. Notwithstanding these objections, ARI responds as follows:

The law firm of Cater and Willis has filed a lawsuit in Louisiana seeking damages for redhibition, a cause of action unique to Louisiana. According to a statement given to the Court at the first fairness hearing, this action was brought on behalf of at least 50, and perhaps as many as 100, Louisiana clients. The redhibition claim was valued at between $25,000 and $50,000 per claimant, thereby making the value of the redhibition litigation somewhere between $1,250,000 and $5,000,000. The damages sought in this suit allegedly were incurred as the result of the implantation of Accufix Atrial "J" Pacemaker Leads, Model Nos. 329–701 and 330–801 ("Accufix Leads"). Accordingly, the redhibition suit was a Leads–Related Claim, as that term is defined in the Agreement of Compromise and Settlement, filed with the Court on November 20, 2000 (the "Agreement"). In an attempt to resolve all pending Leads–Related Claims, ARI has offered to pay $300,000 in resolution of the redhibition claims filed by the law firm of Cater and Willis in Louisiana, contingent on the settlement in MDL–1057 reaching Final Approval, as that term is defined in the Agreement. Any such payment will come from the Reserve Fund created by the Agreement. Section 6.3.2 of the Agreement specifically provides that "[t]he Related Parties, shall have the exclusive right to utilize any or all of the Reserve Fund as the Defendants shall deem appropriate to pay for any and all expenses related to Leads Related Claims, including attorneys' fees, litigation costs, judgments and/or settlements relating to any Lead Related Claims."

(doc. 1016).

■ Fourth, when all of the facts are considered, the so-called "secret agreement" to pay class members "to remain silent" is revealed for what it is: an agreement to settle—for less than a third of their estimated minimum value—a group of Leads–Related Claims, using the money from a fund specifically established under the Settlement Agreement for that purpose. In exchange for this payment, ARI obtained an agreement from the Louisiana class members that they would support, and not opt-out of, the Second Settlement.

There is nothing improper with such an agreement, and ARI obtained it in order to minimize the risk of potential future litigation which could be a costly drain on its assets, including the Reserve Fund. If this Court were to follow Public Citizen's conclusion, we would, in effect, be giving the Adams Objectors "special treatment" by penalizing them to the sum of $300,000 for the simple fact that they happen to reside in the one state that allows claimants to be awarded additional statutory recovery, as opposed to the other 49 states which apparently do not. Such a result would be unjust and would result in "negative special treatment."

Fifth, after reviewing all of the facts, it appears that the Adams Objectors were not the beneficiary of "special treatment" as compared to the class members as a whole, but rather, under Louisiana's unique Napoleonic Code, were entitled to receive several times more than the $300,000 amount that they ultimately settled for. If anything, this Court finds that the Adams Objectors sacrificed their individual claims for the good of the class as a whole in order to allow this class action to move forward toward settlement. This alleged "side deal" is considered by this Court to be open to the public, fair, adequate, and reasonable for the class as a whole, and we commend Counsel for ARI and the Louisiana claimants for finding an innovative resolution to their disputes with each other.

Sixth, Public Citizen in its briefs and during the Hearing has repeated alleged that there appears to be "collusion", "side deals," "secret negotiations," and "side agreements." During the Hearing, this Court asked Ms. Frost what specific evidence did she have to offer the Court about such activity between the PSC and the private Plaintiffs' Counsel, she could not offer any besides mere speculation, self-serving hearsay, and the fact that the Objectors to the First Settlement, were no longer objecting to the Second Settlement.

The Court takes note of the fact that Public Citizen's own client and past Objector to the First Settlement, Harold Reed, has decided to opt-out of the class rather than join Public Citizen in their briefs. The Court can only conclude that the past Objectors, such as Public Citizens' client Mr. Reed, have decided to opt-out or are otherwise satisfied with the terms of the Second Settlement and no longer wish to object. No more and no less is offered by the lack of Objectors to this Settlement. Mere speculation and conclusory accusations such as those offered by Public Citi-

zen, does not substitute for evidence of "collusion."

Finally, Ms. Frost stated in open court when asked what specific evidence she had proving, demonstrating, or supporting collusion, "side deals", and special treatment of the Adams Objectors, that she had no substantive or specific proof or such illegal actions, but merely wanted the Court to investigate the inferences that her discovery responses provided. This Court believed that, after reviewing the record of February 15th Fairness hearing, the PSC, Plaintiffs' Counsel and Defendants' Counsel, provided reasonable explanations for Public Citizen's concerns. *See* Herbert S. Newberg & Alba Conte, *Newberg on Class Actions* § 11.51 (3d ed. 1992) ("[C]ourts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered.").

Several members of the PSC and the private attorneys also stated in open court that they were not aware of any side deals, collusion and secret agreements in regards to the Adams Objectors, and unless otherwise refuted, this Court has no direct evidence of such behavior, even when after questioning all of the Parties present on the subject.

Having reviewed the concerns expressed by Public Citizen as to the fairness, adequacy, and reasonableness of the Second Settlement, the Court finds that for the reasons expressed on the record at the Fairness Hearing and in the Parties's briefs, the Court has fulfilled its judicial role duty under Rule 23(e) and we find Public Citizen's concerns have been addressed by the Court, explained by the Parties, and are found to not rise to the level of collusion, "side deals," or special treatment so as to reject the terms of the Second Settlement and Plan of Allocation as now expressed in the Agreement.

### 7. *The Public Interest.*

The public interest favors approval of the settlement. The Second Settlement guarantees ongoing fluoroscopic screening opportunities for all settlement class members who currently have a working Lead. Without a settlement, there is no guarantee that Lead recipients will be able to receive necessary fluoroscopic examinations. Additionally, the Settlement places under the control of the Court substantially all of ARI's remaining assets and a $6 million contribution from the Australian Defendants.

The Plan of Allocation permits the Court, through the Settlement Master, to allocate fairly the settlement proceeds to all members of the class. Absent a settlement, class members, even if successful at trial, may receive nothing. By the time the trial and subsequent appeals are resolved, many of the class members will have passed away. As this Court is well aware, the average age of each class member is about 77.5 years of age. These class members, moreover, already possess cardiac complications.

We find, therefore, it is in their interest and the public interest that the Court approves the Second Settlement and provides members of the class with an opportunity to make claims against the Settlement Fund.

The Second Settlement benefits the public interest. It frees not only the valuable judicial resources of this Court, but also of all the transferor federal courts, state courts which had Lead cases, all courts which would have dealt with the mini-trials which have occurred after any class verdict in favor of plaintiffs, and all appellate courts which would have visited the issues in this case at least once.

More significantly, this Settlement ensures that class members with unfractured, currently implanted Leads will continue to have reasonable unreimbursed expenses related to fluoroscopic examination paid for, as well as receiving the benefit of ARI's regulated activities and the ongoing analysis of clinical data by the independent PAC, while at the same time providing significant financial benefits to those who claim to have been injured as a result of a Lead implantation. Thus, a substantial number of class members will be receiving the best available monitoring care to insure that as few as possible suffer any adverse health effects from their Leads, and those who claim to have been injured will also recover under the Second Settlement. Clearly, this is a benefit to the public interest.

Moreover, the public interest is served by the resolution of this matter. This is a complex class action case which, as complex mass tort litigation typically does, has placed a significant strain through its protracted and costly proceedings on the Court and its docket. The resolution of this case will end the hard-fought battle between these Parties that is only serving to deplete the assets of one of the primary defendants.

Furthermore, the public has an interest in seeing individuals recovering something for their compensable injuries, not protracting litigation until one of the primary Defendants has depleted its resources to the point of exhaustion. The settlement recognizes the mature age of the class and seeks to provide them with immediate compensation for their injuries as well as continued medical monitoring. The settlement also seeks to insure that everyone is compensated by providing a Holdback Provision. Certainly, the immediate compensation and medical monitoring of the class members will remove potential burdens on the overall health system and the public at-large. Thus, the Court finds that the public interest is significantly served by

the Second Settlement and the Plan of Allocation.

Finally, this settlement directly answers and corrects all of the concerns the Sixth Circuit expressed in its reversal and remand of the First Settlement. Specifically, the class members who choose to can now opt-out of the Second Settlement and pursue the litigation on their own against the Defendants without the due process constraints of a "limited fund" preventing further recovery.

### J. *The Court's Holding*

According to Rule 23 of the Federal Rules of Civil Procedure, court approval is required to settle a class action.

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs.

Fed.R.Civ.P. 23(e) The law generally favors the settlement of complex class actions. *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 246 (S.D.Ohio 1991); *see also* 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions*, § 11.41 (3d ed.1992).

There are three steps which must be taken by the court in order to approve a settlement: (1) the court must preliminarily approve the proposed settlement, (2) members of the class must be given notice of the proposed settlement, and (3) after holding a hearing, the court must give its final approval of the settlement. *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983); *Enterprise Energy Corp.*, 137 F.R.D. at 245; *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 369–70 (S.D.Ohio 1990).

Although Rule 23(e) is silent as to the standard courts should apply to approve or disapprove a proposed settlement, *Parker v. Anderson*, 667 F.2d 1204, 1208 (5th Cir.

1982), the standard developed by the courts over the years is to determine whether the proposed settlement is fair, adequate, and reasonable under the circumstances, and whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued. *See In re Rio Hair Naturalizer Prod. Litig.*, No. MDL 1055, 1996 WL 780512, at *11 (E.D.Mich. Dec.20, 1996) (citing Manual for Complex Litigation, § 30.42 (3d ed.1995)); *see generally Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir.1990).

The court cannot modify the proposed settlement, but must approve or disapprove the proposed settlement as a whole in relations to all of those concerned. *See Evans v. Jeff D.*, 475 U.S. 717, 727, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986); *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir.1983); *In re Rio Hair Naturalizer Prod. Litig.*, supra, at *11 ("The touchstone for final approval is the effect on the class 'as a whole' " in light of the particular circumstances....").

The district court bases its preliminary approval of a proposed settlement upon its familiarity with the issues and evidence of the case as well as the arms-length nature of the negotiations prior to the settlement. *In re Dun & Bradstreet Credit Servs. Litig.*, 130 F.R.D. 366, 370 (S.D.Ohio 1990). The court should also determine that the settlement is neither illegal nor collusive. *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir.1983); *In re Dun & Bradstreet*, 130 F.R.D. at 370.

With such preliminary approval, the settlement is presumptively reasonable, and an individual who objects has a heavy burden of proving the settlement is unreasonable. *Vukovich*, 720 F.2d at 921 (citing *Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 551, (6th Cir.1982), *rev. on other grounds*, 467 U.S. 561, 104 S.Ct. 2576, 81

L.Ed.2d 483 (1984)); *Enterprise Energy Corp.*, 137 F.R.D. at 246.

Being a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement. *In re Southern Ohio Correctional Facility*, 173 F.R.D. 205, 211 (S.D.Ohio 1997); *see also In re Rio Hair Naturalizer Prod. Litig.*, supra, at *11; *Parker*, 667 F.2d at 1209; *Manual for Complex Litigation*, § 30.42 (3d ed.1995). Consequently, those objecting to the proposed settlement have a heavy burden of proving the unreasonableness of the settlement. *In re Southern Ohio Correctional Facility*, 173 F.R.D. at 211.

■ Notice of the proposed settlement should be given to all those affected by it. *Vukovich*, 720 F.2d at 921; *In re Dun & Bradstreet*, 130 F.R.D. at 370. All parties should be given the opportunity to consider the settlement and respond to it. *Id.*

The district court may give its final approval of a class action settlement if it determines that the settlement is "fair, adequate, and reasonable, as well as consistent with the public interest." *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir.1990); *see also Enterprise Energy Corp.*, 137 F.R.D. at 245–46; *In re Dun & Bradstreet*, 130 F.R.D. at 369. This is determined by examining the settlement "in its entirety and not as isolated components." *Enterprise Energy Corp.*, 137 F.R.D. at 245. The court is not "to determine the merits of the controversy or the factual underpinning of the legal authorities advanced by the parties." *Vukovich*, 720 F.2d at 921.

When determining whether the proposed settlement is fair adequate, and reasonable, the court takes into account several factors:

(1) the plaintiff's likelihood of ultimate success on the merits balanced against the amount and form of relief offered in settlement;

(2) the complexity, expense and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the judgment of experienced trial counsel;

(5) the nature of the negotiations;

(6) the objections raised by the class members; and,

(7) the public interest.

*In re Dun*, 130 F.R.D. at 371 (citing *Vukovich*, 720 F.2d at 922); *Enterprise Energy Corp.*, 137 F.R.D. at 245; *Thompson v. Midwest Foundation Independent Physicians Association*, 124 F.R.D. 154, 157 (S.D.Ohio 1988).

With these rules in mind, the Court now turns to an examination of the proposed settlement. The Court has previously made a preliminary approval of the Second Settlement and the Plan of Allocation. In addition, the Court notes that the Notice sent to the class regarding the Second Settlement of this matter was reasonable. Therefore, the Court will now proceed with an analysis of the factors involved in a determination of whether this proposed settlement is proper.

In connection with the First Settlement, the Court found that the Parties to the Settlement satisfied the necessary elements for settlement approval (doc. 712). The Court of Appeals did not fault this Court in finding that the Settlement was fair. To the contrary, the Sixth Circuit merely held that the Settlement had to permit class members with the opportunity to opt-out.

The Second Settlement permits class members the right to opt-out. Accordingly, the reasoning that the Court applied in finding the First Settlement was fair also applies to the Second Settlement.

This settlement is fair, adequate, and reasonable. This revised settlement di-

rectly addresses the concerns of the Sixth Circuit: any Accufix claimant may exclude himself or herself from the settlement. Moreover, the decision to settle this case reflects the considered judgment of experienced trial counsel who intensely litigated this case as a whole.

The Second Settlement cannot be assessed in a vacuum. The Agreement must be balanced against the significant risks for the class, namely: the serious question about jurisdiction over Pacific Dunlop and Nucleus; the depletion of Teletronics' available funds through further prosecution of this matter; the enforcement of actions against Pacific Dunlop and Nucleus may be difficult, if not impossible; the time and costs in litigating this action against Pacific Dunlop and Nucleus "may be significant, if not unfeasible altogether;" and, given the mature age of the class and the time necessary to prosecute this matter to judgment, a large number of class members would not see and enjoy any award even if successful.

The implantation of the "J" Leads into the Class Members signified new hope at fulfilling a longer lasting life. Having discovered that the instrumentality placed within their bodies were defective, class members and their families have engaged in this litigation for more than four years. The average age of the class is 77.5 and time is of the essence. The Agreement as drafted would insure that class members receive immediate benefits for their injuries as well as continue to have expenses related to fluoroscopic examinations paid.

Nothing in the settlement prevents a class members from seeking adjustments in their remedies if their situations become worse on account of defective Leads. In fact, the Agreement specifically provides the Settlement Master with discretion to address special problems. Additionally, the settlement provides a Holdback Provision to insure that it serves a greater good for the greatest number of class members including "future claimants."

Finally, the Court recognizes that although some 500 cases were transferred to this Court by the MDL, at that time, there were many cases that had been filed in numerous state courts around the county, some of which were rapidly approaching trials. An injunction was issued by this Court which were honored by state court counsel, even though substantial resources and efforts in preparing their cases for trial were expended by those private counsel.

It is very likely that the private attorneys provided the PSC with materials that they developed which provided assistance to the PSC in prosecuting this case. In addition, the pressure felt by Defendants in the continued prospect of prosecuting numerous state court proceedings also likely contributed to the resolution of this litigation.

It must not be forgotten that each of these private state attorneys had fee and expense arrangements with their clients that have not been fulfilled due to this Court's injunction. Those attorneys had taken on their client's causes fully expecting to be paid for the services they provided. The fact that the PSC has agreed to compensate these private attorneys for their fees and costs out of the PSC's lump-sum award for legal services benefitting the Class, does not suggest that fraud, collusion, special treatment, secret deals, etc. are present in this case.

The PSC has advised the Court that the fee agreements with the private attorneys would be compensated from the one-lump sum award that is granted by this Court. Their compensation fee would be based on a measurement of the value of their assistance to the PSC and to the class as a whole. The PSC has also informed the Court that if a fee dispute arises between

the PSC and private state counsel, then that dispute could be brought before this Court for resolution.

The Court also cautions the PSC, in general, and the private state counsel, in particular, that whatever compensation arrangements those attorneys had with their state court clients should be adjusted by the amount of compensation they receive from the fee and expense awards that is granted by this Court in order to prevent an issue of double-billing from arising from such an arrangement.

As of the date of this Order, the Class totals over 25,000 members, approximately 13,000 members are alive and 12,000 are deceased, with the average age of the class members estimated by the Settlement Master to be approximately 77.5 years of age. The Court is not aware of any remaining Objectors to this Second Settlement, which is remarkable when considering the factual and procedural histories of this case, as well as the fact that there were over 50 Objectors to the First Settlement who chose to contest that Settlement to the Court of Appeals.

Therefore, based upon the foregoing, this Court finds that the Second Settlement is fair, adequate, and reasonable in light of the circumstances of this case and to the Class as a whole, and we hereby APPROVE this Second Settlement for the reasons set forth above (*see* doc. 1018).

### III. CONCLUSION

The Court has carefully reviewed all aspects of the proposed Second Settlement Agreement and Plan of Allocation as well as the above noted Objections to such Agreement. Viewing the Second Settlement Agreement in its entirety, the Court finds that the proposed Settlement is fair, reasonable and adequate.

Accordingly, for the reasons stated above and for those stated in the Parties' accompanying memoranda in support, this Court hereby GRANTS the Joint Motions to Approve the Class Action Settlement (*see* docs. 1016, 1018 & 1021).

The Court's Order regarding the PSC's Memoranda in Support of its Application for Attorney Fees, Expenses, and Class Representative Awards (docs. 640, 689, 690, 965, 1018, 1020, 1029 & 1096); Public Citizen's Application for an Award of Attorney Fees and Expenses (doc. 995); and Robert A. Perez, Sr.'s, Serving as Local Counsel, Application for Reasonable Attorney Fees and Expenses on Behalf of Class Member, Harold Reed (doc. 989) has been entered contemporaneously with this Order.

SO ORDERED.